MICHAEL M. GURDIN AND MARLENE GURDIN, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Gurdin v. Comm'r
Docket Nos. 3851-74, 4450-74, 4841-74, 4843-74, 5489-74, 5525-74, 5532-74, 5541-74, 5631-74, 5661-74, 5670-74, 5737-74, 7157-74, 8936-74, 8979-74, 1347-75, 2279-75, 2393-75, 2400-75, 4997-75, 5001-75, 5336-75, 5397-75, 7201-75, 7202-75, 7203-75, 8032-75, 8037-75, 8142-75, 4370-76, 5666-76, 5898-76, 10666-76, 10690-76, 4231-77, 4404-77, 5123-77, 5134-77, 6074-77, 6075-77, 6248-77, 6252-77, 6257-77, 6269-77, 6946-77, 7229-77, 7230-77, 1955-78, 6668-78, 2293-79, 19646-81. United States Tax Court
T.C. Memo 1987-69; 1987 Tax Ct. Memo LEXIS 65; 53 T.C.M. (CCH) 14; T.C.M. (RIA) 87069; February 3, 1987. Robert L. Dunnett and Linda E. F. Lach, for the petitioners. Lawrence G. Becker and Michael Gendelman, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION (Popularch Productions Issues) DRENNEN, Judge: These consolidated cases were assigned for trial or other disposition to Special Trial Judge Fred R. Tansill pursuant to section 7456(d) (redesignated as section 7443A(b) by the Tax Reform Act of 1986, Pub.L. 99-514, section 1556, 100 Stat. 2755 and Rules 180, 181 and 183. [2] The Court accepts Special Trial Judge Tansill's findings of fact, with some modifications, and agrees with the conclusions reached by him, as set forth below. *69 OPINION OF THE SPECIAL TRIAL JUDGE TANSILL, Special Trial Judge: Respondent determined income tax deficiencies and additions to tax for each of the petitioners for the taxable years as follows: Additions to
Name of
Taxable
Deficiency
Tax under
Petitioners
Docket No.
Years
in Income Tax
Sec. 6653(a)
Michael M. Gurdin
3851-74
1970
$23,305.00
$1,165.00
and Marlene Gurdin
1971
52,421.00
2,621.00
7202-75
1972
38,157.00
1,908.00
6248-77
1973
425,522.00
21,276.00
Susan J. Supriano
4450-74
1970
32,813.00
1,641.00
1971
19,944.00
997.00
5898-76
1972
37,852.00
1,893.00
6074-77
1973
47,995.00
2,400.00
Walter M. Kearns, Jr.
4841-74
1970
27,363.00
1,368.00
and Abigail Keans
1971
68,517.00
3,426.00
7201-75
1972
18,769.00
938.00
2293-79
1973
7,915.00
396.00
1974
9,254.00
463.00
Stanley Fleishman
4843-74
1970
76,162.00
3,808.00
and Doris Fleishman
1971
307,078.00
15,354.00
1972
104,708.00
5,235.00
6946-77
1973
1,270,289.00
63,514.00
Robert Forsberg
5489-74
1970
1,134.05
56.70
and Melitta Forsberg
1971
1,559.78
77.98
Estate of William B.
5525-74
1970
1,311.36
65.57
Gilbert, Deceased,
1971
1,241.24
62.06
and Marguerite A. Gilbert
Irwin Gostin and
5532-74
1970
5,106.00
255.00
Margit Gostin
1971
13,266.00
663.00
8032-75
1972
11,034.00
552.00
5123-77
1973
9,622.00
481.00
Louis S. Katz and
5541-74
1970
4,095.00
205.00
Eleanor Katz
1971
12,074.00
604.00
8037-75
1972
8,791.00
440.00
5134-77
1973
14,414.00
721.00
Adolph M. Koven
5631-74
1970
15,825.00
$ 791.00
1971
10,545.00
527.00
Jerome J. Sievers and
5661-74
1970
27,130.00
1,357.00
Margorie Sievers
1971
35,915.00
1,796.00
7203-75
1972
24,565.00
1,228.00
7229-77
1973
304,229.00
15,211.00
Lucille S. Atmore and
5670-74
1970
852.00
43.00
the Estate of
Edward A. Atmore,
Deceased, Lucile S.
Atmore, Executrix
8142-75
1972
283,959.00
14,198.00
Lucille S. Atmore
6075-77
1973
87,210.00
4,361.00
1974
142,536.00
7,127.00
Sippi Nazarian and
5737-74
1970
148,379.00
7,419.00
Mildred Nazarian
1971
38,316.00
1,916.00
1972
52,453.00
2,623.00
Mason A. Roberson and
7157-74
1970
8,860.00
443.00
Doris B. W. Roberson
1971
4,721.00
236.00
10666-76
1972
7,259.00
363.00
6257-77
1973
14,912.00
746.00
Matt D. Offen and
8936-74
1971
62,539.43
Johanne Offen [3]
1972
11,501.97
10690-76
1973
142,803.00
7,140.00
6668-78
1974
833.00
42.00
Victor M. Sborov
8979-74
1971
10,550.00
527.50
Albert Shell and
1347-75
1971
7,918.00
395.00
Martha Shell
4370-76
1972
9,873.00
494.00
6269-77
1973
889.00
44.00
Stuart S. Weisenberg
2279-75
1970
14,349.68
717.48
and Gilda Weisenberg
1971
77,392.71
3,869.64
Joseph Weisenberg
2393-75
1970
28,567.70
1,428.38
and Gladys Weisenberg
1971
101,063.26
5,053.16
Louis Marchisoto and
2400-75
1970
14,425.41
721.27
Josephine Marchisoto
1971
71,921.25
3,596.06
Hillard L. Torgan
4997-75
1971
30,183.00
1,509.00
1972
31,475.00
1,574.00
7230-77
1973
15,845.00
792.00
Genevieve Torgan
5001-75
1971
119,198.00
5.960.00
1972
62,293.00
3,149.00
4231-77
1973
1,545.00
77.00
Linda Torgan
5336-75
1971
30,183.00
1,509.00
1972
31,475.00
1,574.00
Gary Devore and
5397-75
1971
204,641.44
10,232.07
Marcia C. Devore
1972
215,000.39
10,750.02
4404-77
1973
8,899.00
445.00
William Berman and
5666-76
1972
8,144.00
407.00
Nana Berman
6252-77
1973
1,794.00
90.00
Judith P. Breen [4]
1955-78
1971
24,913.00
1,246.00
1972
98,719.00
4,936.00
1973
382,794.00
19,140.00
Popularch Productions
19646-81
1970
A California Partnership [5]
1972
*70 Popularch Productions (Popularch), a California Partnership, had its principal place of business in California when its petition was filed.Petitioners Stuart S. Weisenberg and Gilda Weisenberg, *71 Joseph Weisenberg and Gladys Weisenberg, and Louis Marchisotto and Josephine Marchisotto, resided in New York when they filed their petitions. All other petitioners resided in California when their petitions were filed. Joint petitions involve husbands and wives. The issues presented to the Court for determination are the following: 1) Did respondent improperly use documents and processes "occurring before the grand jury" which indicated Harry Margolis (Harry) for tax fraud in California in 1975, so that Baggot and Sells[6]: a) require that this trial be reopened to permit petitioners to cross-examine respondent's witness, Special Agent Nancy Reller, concerning the grand jury'd sources and investigations; and b) require that the testimony of Reller and Special Agent James Lynch be suppressed, along with the exhibits which they identified? 2) Did respondent's motion to compel stipulation fail to meet the requirements of Rule 91(f)? 3) Whether depreciation of $473,220 is properly deductible by Popularch in 1971, computed on the tax basis of domestic distribution rights of the film "Johnny Got His Gun" (Johnny)? 4) Whether Popularch incurred a loss in 1972 of $526,780 *72 on the disposition to Alms N.V. (Alms) of the domestic distribution rights in Johnny? 5) If so, whether that loss was a capital loss or one incurred under section 1231? 6) Whether Popularch is entitled to an interest deduction under section 163(a) of $219,133 based on funds transferred to Alms in 1972? 7) Whether Popularch is entitled to a bad debt deduction of $6,187 in 1973 under section 166(a)(1)? 8) Whether Popularch is entitled to a deduction under section 162(a) for accounting and management fees of $695 in 1973? 9) Whether Popularch had taxable income in 1972 of $1,050,000 arising from discharge of indebtedness by cancellation of a debt it owed to Alms? 10) Whether the individual petitioners are liable for additions to tax as provided by section 6653(a), in 1971, 1972 and 1973? 11) Whether Popularch paid royalties to Koningsplein N.V. (Koningsplein) in 1970 and 1972 and interest to Alms in 1972 which were subject to withholding of income tax under section 1442(a) and whether Popularch was liable for such withholding tax under section 1461 for failure to withhold on such royalty and interest payments? 12) Whether Popularch is liable in 1970 and 1972 for additions *73 to tax under the following provisions: for failure to file Form 1042 for Income Tax Paid at the Source under section 6651(a)(1); for failure to pay the withholding tax imposed by section 1442(a) under section 6651(a)(2); for negligence or intentional disregard of rules and regulations under section 6653(a). Each issue will be considered separately with facts and opinion combined. There are a multiplicity of issues and a large record (414 stipulated paragraphs, over 500 exhibits, 16 days of trial transcripts, two post-trial depositions, 14 witnesses, substance versus form arguments, and many objections and motions). There are a large number of petitioners in these consolidated cases (44 petitioners in 51 dockets). The age of these cases (15 filed in 1974, 14 in 1975, 5 in 1976, 13 in 1977, two in 1978 and one each in 1979 and 1981) and the old taxable years involved 1970 through 1974 are also factors *74 to consider. The issues themselves are all related to a partnership, Popularch; IRS adjustments to its information returns (Forms 1065) effected partnership distributions to each of the petitioners/partners. Those IRS adjustments which were controverted were first severed and the severed issues were then consolidated for trial, briefing and opinion. All petitioners were represented by the same counsel at trial. First, we will make general findings of fact to serve as a frame of reference for the specific issues to be dealt with later. GENERAL FINDINGS OF FACT (The Genesis of Johnny) Some of the facts have been stipulated and are so found. Dalton Trumbo (Trumbo), a prominent screen writer, wrote an anti-war novel, first published in 1939, titled "Johnny Got His Gun" (novel). The novel received awards and achieved some notoriety because of its unrelenting and gruesome theme depicting an American doughboy in World War I who was a quadriplegic and faceless. In 1963, Trumbo wrote a screenplay (screenplay) adapting the novel to the movies. Thereafter, Trumbo, who owned the rights to the screenplay, tried unsuccessfully to interest various movie producers in the screenplay. *75 These persons believed such a film would be a financial filure due to its subject matter and the way in which that subject was presented. In this effort, Trumbo involved his son-in-law, Bruce Campbell (Campbell) who had experience in television and in production of motion pictures. In 1969, Trumbo and Campbell formed a joint venture in which the rights to the screenplay were equally shared. Their joint efforts were, however, fruitless at that time. In 1970 Simon Lazarus (Lazarus), a wealthy friend of Trumbo's in Southern California, became interested in Trumbo's screenplay. He contacted his attorney, Ben Margolis (Ben), who with Lazarus when involved Ben's brother, Harry, also an attorney, to explore financing, production, and distribution of a film, also to be titled Johnny, which could be produced based on the screenplay of the novel. Harry, Ben, Trumbo, Campbell, Lazarus, Scope (a law partner of Ben) and Aubrey Finn (Finn), an attorney representing Trumbo, all met to explore the screenplay potential early in February, 1970. Harry agreed to investigate and explore the possibility of raising funds from some of his clients and investors. The anticipated budget for producing the *76 film Johnny initially ranged up to $900,000, which Campbell regarded as inadequate; earlier, he had projected production costs ranging from about 1.5 million to 2.4 million dollars. Lazarus explained that Trumbo wanted to make a film of Johnny and was prepared to do whatever was necessary to achieve that result, including contributing his services and his script to insure that the film was made. Harry called a number of his clients to inquire if they were interested in participating in the production and distribution of Johnny, indicating there would be no economic risk to them. A number of Harry's clients evidenced their interest [7] in making the film as an anti-war statement or as a social project and indicated their willingness to proceed. Harry then informed Lazarus that financing the venture was feasible. Harry thereafter controlled the financing, by agreement of all the parties. On March 2, 1970 Harry sent a memo to his brother, Ben, with a proposal for the Johnny venture as follows: *77 capital -- $650,000 represented by 26 shares of $25,000 each; net profits to be distributed to Trumbo -- 45 percent, Lazarus -- 3-1/3 percent, Ben's law firm -- 3-1/3 percent and Harry's law firm 3-1/3 percent; of the remaining 45 percent, 65 percent was to be the share of the investors and 35 percent was to be divided equally between Ben's law firm and Harry's law firm. Further, Harry would control the selection of investors and their representatives so as to insure agreeable and cooperative individuals. It was also contemplated that Ben's law firm would hire a full time lawyer for the Johnny project. This memo also refers to the Margolis "system" for implementing the proposals. (The Margolis System) This reference to "system" has to do with terminology used in Harry's law firm which referred to the technique evolved there of effective tax planning for clients and investors. It involved the circulation of money. In that process, the system utilized a number of domestic and foreign legal entities to ensure that the tax planning would be consummated. Entities such as trusts, corporations, partnerships, banks and individuals were involved and were described in Harry's law firm *78 as "system entities." For the purposes of the present case, the non-U.S. entities involved were located primarily in the Netherlands Antilles with some in the Bahamas and at least one in Panama. In the case of the entities not legally controlled by Margolis, there was a high degree of cooperative support amounting to effective transactional control. Because so much of the system was controlled by Harry he assured investors of a given tax result when invoking the system. Because Harry is so entwined in the series of transactions here involved, his transactional and operational practices are relevant to the Court's determination of the true substance of the transactions. See Fed. R. Evid. 406. Some of the offshore system entities were situated in Curacao in the Netherlands Antilles. That location was included under and subject to the United States/Kingdom of the Netherlands tax treaty under which residents and entities of the Antilles were not subject to the United States income tax on interest, dividends and royalties derived from sources within the United States under certain circumstances. [8]
*79 Some of the foreign entities involved in the system were previously established businesses but others were established at Harry's suggestion. Harry enjoyed excellent relations with several prominent and important business people in the Antilles and in the Bahamas, notably Dr. A. A. Smeets and Dr. Alveras Correa, both of Curacao. They were the creators and owners of most of the Bahamian and Antillean entities with whom Harry dealt. [9]
Harry visited the foreign locations frequently, kept the foreign entities in the system under constant surveillance, and trained a number of their employees in his law firm's office. Another requirement of the successful operation of the system was the careful, ongoing surveillance maintained over various transactions and movements of money. Ron Aldophson, *80 a CPA who managed the internal accounting section in Harry's law firm, maintained a large diagram in his office to follow the money movements and guide the amounts of funds involved in system money movements. It was conventional in all of these cases for telephone calls to be made several days in advance of money movements by the entities to all involved, including the banks, so they were aware of what was going on. Confirmation letters of instructions in such instances were cmmon. Banco Popular was a friendly bank in Curacao for many of Harry's accounts, plans and trusts. One of the devices employed in Harry's office was a series of forms designed and intended to control the movements of funds within the system. These were referred to as "authorizations" and an appropriate check mark on the forms indicated where the funds were to go and that the funds were to circulate within the system, if such was the case; such funds neither enriched nor reduced the total money supply of the system and were simply transfers of money for specific purposes, many of which are not disclosed in the record. Careful surveillance and records were kept of all of the "circulating money movements" *81 by Harry's law firm. Additionally, in many instances the actual accounting records were also kept by that office. As a result, at the direction of an attorney from Harry's office, the various entities transacted business with each other and with Harry's clients having accounts with the various entities. Thus, "a money movement" occurred when pursuant to a direction from Harry's office funds were transferred between system entities or through bank accounts maintained by Harry at various banks including Banco Popular in Curacao and Union Bank or Barclay's Bank in Los Angeles. Each time a transaction was planned involving clients or system entities, a written record of that transaction was made and kept by a specific attorney in Harry's office. This was called a "system account." These were not routine accounting documents in the traditional sense but rather informal records of money paid by clients into the system, transactions undertaken with that money or on behalf of that client as well as money paid to the client out of the system. In the case of the ciorculating transactions the funds passed among or between entities by means of account debits and credits with money neither *82 coming into or going out of the system. Directions for all the activities undertaken by Harry's clients and system entities originated from Harry's law office. That office would send drafts of letters or summaries of transactions, called "planning memoranda," from which necessary documents could be prepared on the local stationary and letterhead of the entity involved, for the signature of an appropriate officer of that entity. The bottom line of all of this was that Harry, even though rarely an officer, partner, or even a stockholder in any of the various entities (except for Anglo Dutch), effectively controlled all of the operations within the system. It is equally clear that all planning was done with an eye to beneficial tax effects. As Harry himself said, his efforts were basically directed to reducing taxes and increasing tax free income. Many of the so-called money movements were not meaningful from a Federal tax point of view. [10] Where transactions and money movements occurred between system entities, they were never freely negotiated at arm's-length but rather were all carefully preplanned, directed and controlled by Harry. *83 (System Entities) Among the various system entities encountered in these consolidated cases are ABC, Koningsplein, Alms, Minerals, CIT, PMSA, Anglo Dutch, Rich, Entertainers and Popularch. Three non-system entities are encountered, being the Union Bank and Barclay's Bank, in Los Angeles, and IPS, a movie production company employed by Rich. A brief description of each of the system entities follows: Aruba Bonaire Curacao Trust Company, Ltd. (ABC) was a Bahamian trust company located in Nassau. In 1962 Harry had suggested to his friend, Dr. Alveras Correa of Curacao, Netherland Antilles, that if Correa were to establish a trust company in the Bahmas, Harry would give that company all of his foreign trust business. As a result the company was formed and thereafter catered to Harry's clients with great diligence and care. Harry had made ABC trustee of a number of trusts his office had prepared; thirty-two petitioners in these consolidated case were either beneficiaries or settlors of trusts created by Harry or his law firm of which ABC was trustee. Harry effectively controlled ABC. Koningsplein N.V. (Koningsplein) owned over 99 percent of ABC. Sir Guy Henderson (Henderson), *84 J. Vienna Johnson (Johnson), Marie Denise Jobin (Jobin) and Anthony In der Rieden (In der Rieden) owned the remaining equity in ABC. The managers of ABC were also four employees of Curacao International Trust Company (CIT). Financial statements and tax returns of ABC indicate that it paid no employee sharies during the tax years here involved. Those persons actually employed by that company were on the payroll of Harry's law firm. They usually came to Harry's office in Saratoga, California in pairs for training periods of 4 to 6 weeks and then returned to Nassau. World Entertainers (Entertainers) also was a Bahamian corporation established at the direction of Harry. It was owned 99.5 percent by ABC. The remaining equity was owned by Henderson, Jobin, Johnson, Correa and Everd van Walsum (Walsum). Jobin, Johnson and Walsum were officers and managers of Entertainers. Koningsplein was a Netherlands Antilles company owned and controlled by Correa. It had its office in Nassau, the Bahamas, during the taxable years at issue. It had been formed at Harry's direction. It effectively owned ABC, Entertainers, World Minerals, and, indirectly, Rich. Alms N.V. (Alms) was a Netherlands *85 Antilles corporation which was owned by Anthony In der Rieden. It had been formed at Harry's direction to serve the tax planning needs of his clients. Alms had no employees and its returns were prepared by CIT who also managed it. World Minerals N.V. (Minerals) was a Netherlands Antilles Corporation owned by Koningsplein and managed by CIT. It had no employees during our taxable years. Presentaciones Musicales, S.A. (PMSA) was a Bahamian corporation of which Jobin was a vice president. Anglo Dutch Capital Company (Anglo Dutch) was a finance company incorporated in California and owned until 1971, half by Harry and half by Walter Joe, a CPA employed by Harry. After 1971, Harry owned all of Anglo Dutch. Also Dutch was used to finance Harry's system activities and loaned money only to clients of Harry and system entities. Alms was a source of funds for Anglo Dutch. Robert Rich Productions Inc. (Rich) was a California corporation. It was incorporated at the direction of Harry for tax planning purposes to be the production company for Johnny. The officers and directors of Rich acted in name only and performed no independent functions. All of the stock of Rich was owned by *86 ABC. It was, in effect, directly controlled by Harry. Popularch Productions partnership, (Popularch), a California partnership, was formed at the direction of Harry as part of the planning for the film Johnny. It was formed to acquire the U.S. distribution rights to that film, as will be discussed later. Curacao International Trust Company (CIT) was located in Curacao from 1970 through 1973. Its business was providing corporate domicile in the Netherlands Antilles. For a fee, CIT would form corporations in the Antilles for individuals from Europe, South America or the United States. It also prepared and filed Netherlands Antilles tax returns, prepared correspondence, financial statements and provided officers for various entities. (Individuals) Harry was an attorney practicing tax law from an office in Saratoga, California during the taxable years. The name of his firm was Margolis, Fischel and Breen. Quentin Breen (Breen) was a partner in the firm. Elaine Fischel (Fischel) was also a partner in the firm in 1966 and 1967. From 1968 through 1970 she was associated with Harry but with an office in Los Angeles.During 1971 and part of 1972 she still did some work for Harry *87 although she was gradually terminating their relationship. Michael Donner (Donner) was an attorney hired by Harry in an administrative capacity in June 1, 1967; that job lasted about a year and then terminated. He remained a friend of Harry thereafter. Ron Aldophson (Aldophson) was the accounting manager of Harry's law firm. He monitored and mechanically managed money movements within the system and coordinated such actions with instructions issued to all of the entities involved. He also reviewed all necessary documents to ensure timeliness and completeness. He occasionally traveled to Curacao to meet with the CIT officers involved in money movements; from 1970 through 1973 that person was In der Rieden. He also met occasionally with Edward DeKort, the manager of Banco Popular in Curacao. Florence Valkenberg (Valkenberg) was employed at CIT's predecessor company from 1964 through 1966 (first period). In 1966 she terminated her employment to have her first child. During this period of time her supervisor at CIT was Everd van Walsum who was the head of the administrative department of CIT's predecessor company. The legal department of CIT during that period was headed by *88 Correa. Valkenberg returned to employment at CIT as a secretary in the legal department on a part time basis from 1968 to 1971 (second period). [11] In that capacity she worked directly for In der Rieden who was then head of the legal department of CIT. During this second period of Valkenberg's employment, her entire activity was involved with various system entities. In this capacity she performed services for Minerals, Koningslein and Alms as well as for ABC and Entertainers. She mailed, filed and arranged for transfers of money to and from Banco Popular in Curacao. While most of Valkenberg's activities centered about Harry's instructions, she occasionally performed typing and other related work for Fischel and Breen. *89 In virtually every instance, a copy of everything prepared by Valkenberg was sent to Harry's office in California. CIT had letterhead stationary for most of the system entities including Alms, Minerals, Koningsplein, ABC and Entertainers, all of which had been printed in the Netherlands Antilles. The law of the Netherlands Antilles required that documents, including agreements and notes, to which an Antilles corporation was a party, be on official paper embossed with the seal of the Netherlands Antilles. Such official paper could be bought only from a government office in the Antilles. Frequently, in dealing with system entities, Valkenberg was instructed to back date a memorandum or letter and she would follow that instruction as directed. Banks in the Netherlands Antilles routinely issued a statement reporting each bank transaction to a depositor. The statements from Banco Popular concerning the various system entities were sent to CIT. Monthly statements reconciling all transactional statements were also issued by Banco Popular. When CIT received any such monthly statements for system entities, Valkenberg would file them on behalf of CIT. When Valkenberg was involved *90 in banking transactions her instructions would come by telephone or written memo from Harry, sometimes through In der Rieden. She would occasionally contact Edward DeKort, manager of Banco Popular in Curacao, to notify the bank of money transfers. She would then prepare confirmation letters for each portion of the money transaction for the various system entities to be sent to the bank after obtaining the signature of an officer at the CIT office. During the second period of Valkenberg's employment the nature of the banking transactions handled through CIT for system entities changed from merely depositing and writting checks to transactions involving the transfers of hundreds of thousands of dollars from accounts at Union Bank or Barclay's Bank in California to the account of a system entity at Banco Popular and then to the account of other system entities at Banco Popular. Money movements from Curacao to the Union Bank or Barclay's Bank were also frequent. On some occasions Valkenberg's instructions were to type documents which were the basis for money transactions which had taken place prior to the typing and execution of the documents. In those instances the documents were *91 typically back dated to the date given by the instructions. CIT maintained files for the various system entities for which it provided domicile. It also maintained files for ABC as well. These contained copies of all letters and contracts as well as the various memoranda received from Harry. Fees charged for CIT services involving system entities were routinely sent to Harry in California where, after his approval, they were paid out of accounts at Banco Popular. CIT also prepared periodic financial statements for the system entities maintaining a copy of Curacao with a copy for Harry in California. (Events Preceding the Formation of Popularch) On March 3, 1970, a written "Memorandum of Agreement" was executed by Trumbo "as Author and Owner of Script and Director of Motion Picture" and Lazarus, Harry and Ben's law firm "on Behalf of Investors." The signature on behalf of the investors was Ben's. He and Harry had drafted this Agreement. This agreement provided that Trumbo was to direct and produce a screenplay from the script owned by Trumbo; that Trumbo was to be the owner of the screenplay, which was to be produced from a budget of approximately $600,000 in cash plus *92 $325,000 in deferred payments, which the investors would make available to Trumbo by borrowing $600,000 from a bank. When the screenplay was completed, Trumbo was to have the final say as to production and distribution.The $600,000, plus interest, was first to be repaid to the bank from the proceeds of the distribution of the film. The profit from distribution of the file was to be divided 45 percent to Trumbo, 45 percent to the investors, and 10 percent to the representatives of the investors named above. Trumbo would form a corporation to which the script and all residual rights would be transferred, with stock as Trumbo wished. On April 4, 1970, Robert Rich Productions, Inc. (Rich), was incorporated in the State of California by Finn, an attorney in the Margolis office. The officers and directors were Finn, Campbell and Frenke, a friend of Trumbo. Rich became a part of the Johnny venture. It was controlled by Margolis. On October 1, 1970, all of Rich's stock was issued to ABC. Harry did most of the tax planning for the Johnny venture, assisted by Scope and Mark Peterson (Peterson), an attorney retained by Ben's law firm specifically to work on Johnny. It was essential *93 to the venture that the domestic distribution vehicle, eventually Popularch, obtain a completed film and Rich was to produce the film. It was Harry's view that Koningsplein was the proper vehicle to sell the United States distribution rights of Johnny and to sell the foreign distribution rights to PMSA. Harry anticipated that if this structure were used and the film proved to be a great success, profits from both domestic and foreign distribution would go to Koningsplein and then to the trusts of which ABC was trustee, without tax or at a very low tax in the United States. Scope and Peterson, under Harry's direction, drafted all of the papers and written agreements for each transaction in the Johnny venture to accomplish these ends. Prior to April 1, 1970, Harry wrote a memorandum to Peterson containing a lengthy list of requirements and directions including the following: a partnership should be involved in the venture; a list of prospective investors in Johnny should be sent to the Union Bank in Los Angeles; a company which had as a principal asset a contract with Trumbo should be prepared to sell this contract to someone; with respect to arrangements whereby ABC would agree *94 to guarantee performance of the partners in the partnership agreement, all of the formalities must be carefully observed. On April 9, 1970, specific details of each of the matters involved with reference to the attorneys were also conveyed by Harry to Peterson including instructions for a bank account for Popularch, who the signatories should be, who should keep the checkbook, who should write the checks and what procedure should be followed in executing the check; also, that the partnership should be established to Donner's or Fischel's office in the law firm; the indemnity agreements for a loan from Union Bank should be redrafted to substitute Popularch for Rich; an agreement should be prepared between ABC and the trusts and Peterson should establish trusts at ABC for Campbell, Frenke, Trumbo, Scope, and Harry. By April 10, 1970, Peterson had prepared and sent to Harry for review a number of the documents which had been envisioned by Harry. These included drafts for the Popularch partnership and a rough draft of a joint venture between Entertainers and ABC pertaining to Johnny. Enclosed with this material was a typed draft of material contained on a tape dictated by Harry giving *95 Peterson instructions and directions. Among these instructions were: letters should be sent to the professionals requesting execution of statements and other documents regarding the Union Bank loan; documents should be prepared to transmit Trumbo's rights and his works to Entertainers who would then sell those items to other system entities; there was also a statement indicating that "we should probably also draft an internal report for (Entertainers) analyzing the entire history of Johnny, as mentioned above, as if the document was written by someone in Massau, analyzing the prospective contract between Entertainers and Trumbo"; preliminary drafts of "overseas contracts" should be commenced, including a contract between ABC and Entertainers with respect to the joint venture for Johnny; and finally, Harry recommended an arrangement for an independent document in which ABC agreed to guarantee performance of each party to the indemnification agreement and the partnership agreement for the amounts for which they are liable, so as to permit easy access to the trusts in the event of a need to use the indemnification agreement. ABC would then give notice of guarantee to each of the parties *96 involved and obtain their approval in writing for the file. Shortly after April 13, 1970, Harry recorded and sent to Peterson an audio tape directing that the assignment agreement between Trumbo and Entertainers was to be put on Entertainers stationary with a cover letter prepared for it. In commenting upon the draft of the joint venture agreement between Entertainers and ABC, Harry observed that "what we really intend to do is have ABC set up the Robert Rich Company." In July 1970, Harry wrote a planning memorandum entitled "Trumbo Memo." In it he noted, while discussing the contracts concerning the Johnny venture between ABC and Entertainers and ABC and Rich, that "the problem of the step-up of the cost of the contracts as processed by Entertainers to ABC to Rich must not be overlooked." He stated that Rich would make salary payments to each artist as well as a series of payments to Entertainers, because of the role the latter played in Harry's tax planning as provider to Rich of the artists employed by Rich. He also stated that payments to Entertainers by Rich should be "step-ups" of the actual costs of the artist to the production. Also, he set out a draft of the letter *97 to be dated July 10, 1970, to the Popularch partners from Fischel. One of the documents drafted by Peterson and Harry was a document entitled "Motion Picture Financing Agreement." It indicated that it was executed on February 3, 1969, between Alms and ABC as trustee of various trusts and that Alms committed itself for one year, subject to renewal, to make available credit to ABC up to $10 million at an annual rate of nine percent interest, with a $4,000 per annum loan fee. The loan fee and one year's interest were payable within 30 days of the execution of the agreement. The agreement further indicated that ABC would be granted credit of eight percent per annum for funds allocated under the agreement but not actually paid to ABC and that the maximum loan for any single project would not exceed $2 million, each loan being the subject of a specific loan agreement. Another of the various drafts of agreements prepared by Peterson and Harry was one entitled Joint Venture Agreement dated February 10, 1970, between Entertainers and ABC. It envisioned the formation of a joint venture to produce and distribute the film Johnny. Under this agreement Entertainers would acquire full ownership *98 of the screenplay and the novel Johnny, toegether with the rights and services of Trumbo and various other artistic personnel to be used in the production of Johnny. Entertainers was to acquire financing under an agreement that ABC had with Alms for a loan of $10 million. One of the other documents prepared by Peterson and Harry which related to the Johnny venture was a document entitled "Agreement" dated March 24, 1970, between Entertainers and Rich. It provided that Entertainers would sell and assign to Rich its rights to the motion picture Johnny for a photoplay based upon said script. Entertainers expressly reserved, however, all other rights in connection with the Johnny activity, including its use in noval form, serialization, theatrical performance, radio recording and all other means of publication. For what was assigned, Rich was to pay Entertainers $225,000 on or before August 1, 1970; Entertainers also agreed to obtain for Rich the services of Trumbo as director and screenwriter to produce Johnny. Trumbo was to have sole and exclusive artistic control over the production of the picture and final authority for hiring cast and crew. No changes could be made to the script *99 of Johnny without the express approval of Trumbo. Entertainers agreed to pay Trumbo for his services in connection with the production of the film. However, Rich was to pay Entertainers for the services of Trumbo, $75,000 on or before August 1, 1970, and $75,000 on or before September 1, 1970. Rich was to pay Trumbo's reasonable expenses incurred in performance of his services between June 1 and December 31, 1970. Entertainers would also supply to Rich the services of Frenke and Campbell as Executive Producer and Producer, respectively, for not more than $100,000 in the aggregate. Entertainers also advised Rich that it had under consideration for some time a number of artists of major stature to perform in Johnny, including at least three major artists for major roles and at least two feature artists of standing in the industry, all of whose salaries would not exceed $600,000. Delivery of signed employment contracts for these artists from Entertainers to Rich would satisfy this contract arrangement. Entertainers also represented that it could and would obtain the services of key personnel in technical areas required for production of the film at a cost not to exceed $100,000, *100 for which service Rich would pay Entertainers the sum of $75,000 covering costs incurred in assembling the services, personnel and script necessary to produce the picture. An agreement dated March 24, 1970, was purportedly entered into by Entertainers, ABC and Rich. In that agreement, Rich agreed to produce and deliver to Entertainers/ABC the motion picture described as "The Photoplay," being a talking motion picture based upon the script of Johnny written by Trumbo. Frenke was designated as Executive Producer and Campbell was named as individual Producer. Trumbo was to be director of photography and have full and complete artistic control over the production of the picture. It was also agreed that the script written by Trumbo would in no way be modified or altered within his specific approval. Trumbo was also given full control of the selection of all artistic and technical personnel who would work on the photoplay. Upon completion of the photoplay, the joint venture was required to pay Rich for said film the total of its negative costs, as defined, together with a fee of $25,000. Rich was also entitled to receive one quarter of one percent of Entertainers/ABC's gross receipts *101 from the completed photoplay in excess of $2,500,000. It was agreed that the negative costs would not exceed $2,200,000 in any event. Rich would pay all costs in excess of that amount. The negative costs referred to were to be paid no later than 12 months afterthe delivery of the completed photoplay.Rich was to advance all sums necessary for actual production of the photoplay and Entertainers/ABC's obligation to reimburse Rich would not arise until the photoplay had been completed. It was agreed that Rich would have sole and exclusive control of the production of the film including budget and scheduling, the hiring of cast and crew, and the manner in which the film was to be completed. Under instructions from Harry, Peterson mailed on April 2, 1970, to Pat Pritchard of Union Bank in Los Angeles, a list of people who were presently considering investing in Johnny. The list was a tentative one and contained a list of 30 individuals or married couples who were interested, including 14 who eventually did invest in the production and distribution of the film. On April 3, 1970, Peterson mailed letters to a number of "professionals," among them Finn, Breen and Fischel (with carbon *102 copies to Harry), which stated in part that "all participants (in the film venture) will have foreign trusts containing in some instances, almost all of their assets." On April 26, 1970, Fischel informed one of her clients who was interested in the venture, Dr. Franklin Ashley, that participation in the production and distribution of Johnny would be offered "only to people who have trusts at ABC and only to people who have assets in the trust and who are in the 50 percent or more tax bracket." Fischel further informed Dr. Ashley that the film venture would be structured from a tax view point to provide tax deductions for the participants if it failed, and tax sheltered profits, if it succeeded. On or about May 15, 1970, Peterson opened a bank account at Union Bank in Los Angeles in the name of Popularch. On June 19, 1970, Harry sent to various professionals a request for their comments, suggestions and questions with regard to a final draft on an investors' letter concerning the veture, written by Harry, Peterson and Scope, dated June 19, 1970, for the signature of J. Vienna Johnson at ABC. That letter indicated that the profits after recovery of costs were to be divided as *103 follows: 1) 3.33 percent to Simon Lazarus for services rendered and to be rendered; 2) 3.33 percent to Harry for services rendered and to be rendered; 3) 10.83 percent to Ben's law firm for services rendered and to be rendered; 4) 7.5 percent to ABC and its associated companies for services rendered and to be rendered; 5) 30 percent to group A investors; and 6) 45 percent to group B investors. A list of the trusts in the Johnny venture was attached to this draft which was identical to that list set forth with the Specific Loan Agreement dated July 6, 1970, containing Johnny investors. On July 24, 1970, Peterson, at Harry's direction, sent the June 19, 1970 draft of the investors' letter to Johnson at ABC, instructing her to type it on ABC stationary, have it signed by an official of ABC, and send copies of those letters to Breen, Donner, Scope, Fischel, Harry, Irwin Gostin and Louis Katz with blank copies to him. Vienna Johnson complied with these instructions and such letters dated August 10, 1970, were sent to the named individuals. Later, Peterson also requested Johnson to send a copy of the investors' letter to Michael Perrett, an attorney representing Edward Atmore. Vienna *104 Johnson again complied with those instructions and sent copies of the investors letter as requested. (Gostin, Katz and Atmore became investors). (Formation of Popularch) The Partnership Agreement, dated March 1, 1970, by which Popularch was formed was prepared by Harry and Peterson. That Agreement provided that management of the partnership was to be vested in a managing partner or management committee or one or more managers to be retained by the partnership. No partner was to receive any salary for services rendered to the partnership for this function. Selection of a managing partner and management committee was by vote of the partners based in direct proportion to each partner's interest in the partnership. The management group was to have exclusive powers of management and it was to have authority to draw checks on the partnership account. It was also agreed that the manager or managing committee could not, without consent of all partners, endorse any note or act as an accommodation party or become surety for any person. The consent of all partners was required to borrow money, lend money or take any other actions on behalf of the partnership. Moreover, no individual *105 partner could, except with the consent of all partners, assign, mortgage, grant a security interest in, or sell his interest in the partnership or its assets, or enter into any agreement as a result of which any person might acquire an interest in the partnership. The individual partners' names, their percentage interests at various times, and the partners' original obligations to the partnership were as follows: Partner's
Partner's
Partner's
Partner's
Approximate
Original
Approximate
Approximate
Interest in
Obligation
Interest in
Interest in
Partners
1970
To Partnership
1971
1972-73
Edward A. Atmore
3.85%
$25,000 3.84%
4.54%
William Berman
3.85%
25,000
3.84%
4.54%
Clayton E. Brock
3.85%
25,000
3.84%
4.54%
Gene A. Carlin
3.85%
25,000
Maria Cole Devore
3.85%
25,000
3.84%
4.54%
Stanley Fleishman
3.85%
25,000
3.84%
4.54%
Irwin Gostin
1.92%
12,500
1.91%
2.27%
Michael Gurdin
3.85%
25,000
7.69%
9.15%
Louis Katz
1.92%
12,500
1.99%
2.27%
Walter M. Kearns, Jr.
3.85%
25,000
3.84%
4.54%
Simon M. Lazarus
7.69%
50,000
2.68%
9.10%
Henry Mayer
3.85%
25,000
3.84%
4.54%
Sippi Nazarian
3.85%
25,000
3.84%
4.54%
Matt D. Offen
3.85%
25,000
3.84%
4.54%
John H. Rafferty
7.69%
50,000
7.68%
9.10%
Mason Roberson
1.92%
12,500
1.91%
2.27%
Albert Shell
3.85%
25,000
7.68%
4.54%
Jerome Sievers
3.85%
25,000
3.84%
4.54%
Susan Valberg Supriano
5.77%
37,500
5.76%
6.82%
Hillard Torgan
3.85%
25,000
3.84%
4.54%
Genevieve Torgan
3.85%
25,000
3.84%
4.44%
West Bay Investors
15.40%
100,000 15.39% *106 The actual agreement was executed seriatim. It was signed twice by five of the partners and not signed at all by John H. Rafferty. While it was executed on behalf of West Bay Investors, it was also signed by three individuals who were also partners in West Bay Investors but not named partners in Popularch, namely Adolph Koven, Robert Forsberg and William Gilbert. It was also signed by a number of individuals who were not named in the agreement as partners: these included Pauline Scott, Phillip Eden, Marion K. Richards, Harold Kazmann and Marion Benson. The partners of West Bay Investors in 1971, their approximate percentage interest in West Bay Investors, and their approximate percentage interest through West Bay Investors in Popularch, were as follows: Approximate 1971
Approximate
Percentage
Percentage
Interest in West
Interest in
Bay Investors
Popularch
* Victor M. Sborov
5.86%
.9%
Albert Goh
11.25%
1.73%
* Robert Forsberg
.89%
.13%
* William Gilbert
.89%
.13%
* Adolph Koven
.45%
.06%
Kipp Stewart
15.76%
2.42%
* Judith Breen
1.79%
.27%
Weisenberg Company
63.55%
9.7% *107 Weisenberg Company also was a partnership. In 1971 the members of that partnership, their approximate percentage interest in Weisenberg Company and approximate percentage in Popularch, through Weisenberg Company, and through West Bay Investors, were: Approximate 1971
Approximate
Percentage
Percentage
Interest in
Interest in
Weisenberg Company
Popularch
* Stewart Weisenberg
28.98%
2.81%
* Joseph Weisenberg
40.57%
3.93%
* Louis Marchisotto
29.98%
2.82%
David Weisenberg
1.44%
.13%
From the time of its formation, through its termination in 1973, actual out-of-pocket cash contributions of capital were made to Popularch, by payment to Harry Margolis in 1971 and in no other year, only by the following partners in the following amounts: Partners
Amount
Edward A. Atmore
$6,250
Walter M. Kearns, Jr.
$6,250
Sippi Nazarian
$6,250
Genevieve Torgan
$6,250
Hillard Torgan
$6,250
West Bay Investors
$6,250
(Loans) An important document prepared by Harry and Peterson which concerned the Johnny venture was a document dated July 6, 1970, entitled "Specific Loan *108 Agreement" between Alms and ABC. The text indicates that it was entered into by ABC on behalf of 26 "settlements" and that $2 million would be loaned by Alms to ABC. The 26 settlements were as follows: Percent of
Group "A"
Producers's * Profits
Total Risk
Atmore - 188-89-90
1.15
$ 25,000  Berman - 160
1.15
25,000
Breen - 235
1.15
25,000
Brock - 183
1.15
25,000
Bush (Gilbert) - 261
.575
12,500
Cole (Devore) - 150
1.15
25,000
Goldenberg (Carlin) - 221
1.15
25,000
Gostin - 245
.575
12,500
Gurdin - 206
1.15
25,000
Hengstler (Forsberg) - 262
.575
12,500
Katz - 187
.575
12,500
Kearns - 246
1.15
25,000
Lang (Fleishman) - 178
1.15
25,000
Lazarus - 166
2.30
50,000
Margolis (Roberson) - 180
.575
12,500
Mayer - 164, 165
1.15
25,000
Nazarian - 182
1.15
25,000
Perdue (Offen) - 167
1.15
25,000
Rafferty - 173
2.30
50,000
Salomon (Eden) - 210
1.15
25,000
Shell - 254
1.15
25,000
Sievers - 185
1.15
25,000
Torgan - 184
2.30
50,000
Valberg (Supriano) - 196
1.725
37,500
Wolff (Koven) - 239
1.15
25,000
TOTAL
29.89 $650,000  Percent of
Reserve Group
Producers's Profits
Total Risk
Benson - 181
1.15
$ 25,000 Kazmann - 234
1.15
25,000
Richards - 213
1.15
25,000
Scott - 250
1.15
25,000
TOTAL
4.60%
$100,000 Group "B"
Campbell - 298
15.0  Above
$650,000 Franke - 298
5.0 Only
Trumbo
25.0  45.0% *109 (The investors in group A above are identical, as is the amount of the risk shown for each, with the partners of Popularch as set forth in the partnership agreement, with the exception of West Bay Investors whose risk is represented by Breen, Bush (Gilbert), Hengstler (Forsberg), Salomon (Eden) and Wolff (Koven). The people indicated to be members of the "reserve group" are the same as the non-partner signatories of the Popularch "partnership agreement." The numbers to the right of the names are the identification numbers of the respective trusts at ABC.) The Specific Loan Agreement further provided that Alms had reviewed the proposed motion picture project, the script of Trumbo and other arrangements made by ABC and had determined that the risk of the project was such that the security presented was not adequate. Therefore, the parties agreed that Alms would be given, as additional consideration for the making of this loan, a sum equal to five percent of all sums received by ABC from the sale or distribution of the motion picture. Prior to March 18, 1970, Rich applied for a loan at Union Bank, Los Angeles. As a condition of that loan, on March 24, 1970, Johnson and Jobin, *110 as representatives of ABC, executed documents entitled "Security Agreement" and "Resolution Authorizing Continuing Guarantees, Endorsement and Guarantee to Notes and Hypothecation of Assets." The second of these documents contemplated that Union Bank would loan Rich up to $700,000. Union Bank records indicate that a loan was made to Rich on or about March 30, 1970, for $30,000 to accommodate the bank's "good customers," ABC and Harry. That loan was renewed in May and July, 1970. The same records indicate that Union Bank was considering a $650,000 loan to Rich for the Production costs of Johnny. On or about July 1, 1970, Rich received an additional loan from Union Bank of $50,000. That loan was arranged by Harry and not by the borrower and it was guaranteed in part by an unrelated company provided by Harry. On or about July 8, 1970, Harry applied for a loan of $450,000 from Union Bank on behalf of Popularch. On or about July 16, 1970, that loan was approved and funds in the amount of $410,000 were provided by Union Bank on or about July 23, 1970. The proceeds of this loan to Popularch were to provide additional working capital for the film, Johnny. Union Bank required, as *111 a condition ofthe loan to Popularch, that the general partners, jointly and severally, guarantee that loan. At the instruction of Harry, [12] the partners of Popularch guaranteed the Union Bank loan by executing "Continuing Guarantees" and "Indemnification Agreements." Phillip Eden, Marion Benson, Harold Katzman, Marion Richards and Pauline Scott also executed those agreements. Union Bank also required, as a further condition of its loan to Popularch, that ABC, as trustee for each partner trust and other foreign trusts, also guarantee the loan to the extent that the partners and the five other individuals might default on the guarantees of the loan. Union Bank's acknowledgment of receipts from ABC of the documents guaranteeing the loan was sent by Johnson at ABC in the Bahamas to Harry. A further condition of Union Bank's loan to Popularch was that all debts owed by the partners of Popularch, to other companies or system entitles working with Harry, be subordinated to the Union Bank loan. To accomplish this, in part, Harry caused a letter to be written in the name of Minerals directed to Union Bank indicating subordination to the Union Bank loan of any claims by Minerals against *112 various partners of Popularch and against Phillip Eden. In connection with the foregoing bank loan at Union Bank, it was necessary to amend the basic Popularch Partnership Agreement to authorize the loan. For this purpose paragraph 5, Management, was modified by adding to subparagraph a) thereof the names of Michael Donner, Elaine Fischel, Quentin Breen, Irving Gostin and Louis Katz as a committee of managers. Subparagraph b) of paragraph 5 was also modified to include language authorizing the committee of managers or any one of them to have the power to borrow funds on behalf of the partnership. These changes were made without the knowledge or consent of the original partners or their representatives and they were first informed of this change by back-dated letters sent by Donner at the instruction of Peterson acting for Harry. The result of this action was that an undated damand note was signed on behalf of Popularch by Donner in favor of Union Bank in the amount of $410,000. At trial Donner had no recollection of signing this note. On January 18, 1971, the *113 note obligation of Popularch to Union Bank was changed to make that obligation payable in monthly installments of $50,000. To accomplish this result, a note for $360,000 payable to Union Bank was executed that day on behalf of Popularch. On or about February 26, 1971, $50,000 was transferred from the Alms account at Banco Popular to the Popularch account at Union Bank as a loan, evidenced by a promissory note dated February 22, 1971, and executed on behalf of Popularch. On or about March 25, 1971, $50,000 was transferred by Anglo Dutch to Minerals' account at Banco Popular, then to the Alms' account at the same bank and then to the Popularch account at Union Bank; the transfer from Alms to Popularch was a loan in form and evidenced by a promissory note dated March 25, 1971, and executed on behalf of Popularch. The $50,000 monthly payment in April was obtained as a loan from Minerals' account at Banco Popular on or about April 28, 1971, which then was placed in the account of Popularch at Union Bank. It was also evidenced by a promissory note, dated April 30, 1971, in favor of Alms, not Minerals. A loan of $40,000 was received from Minerals by Popularch which was transferred to *114 its account at Banco Popular, on or about June 16, 1971, and it too was evidenced by a promissory note of the same date, again in favor of Alms. A $60,000 loan from Alms to Popularch, both through accounts at Banco Popular, was received on or about July 22, 1971. On the same day Alms had received $60,000 from Anglo Dutch. The $60,000 received from Alms was also evidenced by a promissory note dated July 21, 1971. On or about December 1, 1971, $15,000 was transferred from the Alms account at Banco Popular to Popularch as a loan. It was evidenced by a promissory note dated November 23, 1971, in the amount of $35,000, rather than $15,000. [13] None of the loans to Popularch referred to above was guaranteed, collateralized or secured by any security interest. They were all paid to Union Bank as monthly debt payments. Although they only totalled $265,000, [14] the full Union Bank debt was satisfied during 1971 by a method unexplained in the record. Popularch also borrowed $350,000 from Anglo Dutch evidenced by a note dated July 21, 1970, which was executed by Donner as a manager of Popularch. Donner *115 had no recollection of signing this note. Anglo Dutch required neither guarantee, security or collateral from Popularch for its loan. (Production of Johnny) Around the first of April 1970, Campbell began preparing for production of the film, Johnny, and actual production began on June 2, 1970. An organization known as International Producers Services (IPS), was engaged by Rich to provide services for the production of Johnny. It supplied the crew, stages, offices, actors (other than the principals) and supervised the filming of Johnny from beginning to end. Originally, IPS performed services under contract with Rich. After several weeks, Entertainers was substituted for Rich as a party to that contract. Thereafter, IPS continued to deal with the same individuals as in the beginning. It was also necessary for the production of Johnny that there be a contract between the producer and the Screen Actors Guild. In this case that contract was between Rich and the Guild. Campbell and Trumbo, on behalf of Rich, continued their earlier activities of casting the principal parts of the film and hiring production personnel, assisted by two casting directors working with an assistant. *116 Later, the contracts with the principal actors and production personnel were put in the name of Entertainers rather than Rich and were assigned by Rich to Entertainers for a substantial fee. This increased the cost of producing the film, decreased the potential profits taxable in the United States and increased the nontaxable offshore potential profits from the film. This was accomplished under the direction of Harry. The filming of Johnny was completed by September 12, 1970, and the first cutting was completed in January 1971. The original version was two hours and 19 minutes long. A number of major distributors were invited to view this "first cut" film. Warner Bros., Universal International Studios and Fox all had representatives view the film in mid-January 1971. None of these were interested in distributing the film. By March 17, 1971, the film had been cut to its final version of one hour and 43 minutes. The Popularch partners viewed Johnny in the final version on March 17, 1971, and accepted and approved the film. (History of the Distribution Rights to Johnny) A document prepared for the Johnny film venture by Harry and Peterson was one entered into on May 30, 1970, between *117 Entertainers and Trumbo, entitled "Agreement." The May 30 agreement itself related to the performance of services by Trumbo for Entertainers and its successors and assigns, including personal services as a producer and director, author or performing artist. It recited that Trumbo had unsuccessfully attempted for an extended period of time to find a company which would produce a motion picture based upon his screenplay, Johnny, to be directed by him; a full history and documentation of that attempt was prepared and submitted to Entertainers for its consideration. It was noted that Entertainers' investigation revealed that those American motion picture companies contacted by Trumbo either felt that the subject matter and content of the picture would offend potential audiences or else those companies wished to make substantial deletions or modifications of the screenplay over Trumbo's objections, in order to remove the possibility of offensiveness and controversy. The Agreement recited that Entertainers agreed to produce a motion picture based upon the screenplay, Johnny, to be directed by Trumbo. The picture would be produced in such form as Trumbo in his artistic judgment determined *118 to be most suitable. Entertainers specifically agreed that it would in no way attempt to modify or alter the script, except for changes required to keep the production within budget. The parties agreed that Entertainers' agreement to arrange financing and production of the picture under Trumbo's full and complete direction was a major consideration on the part of Trumbo for the execution of the agreement. It was noted that Trumbo had advanced certain pre-production expenses for the motion picture and Entertainers agreed that it would reimburse Trumbo for such expenses as a cost for producing the motion picture. Entertainers specifically agreed that Trumbo would have full control of the selection of all artistic and technical personnel to work on the picture while Trumbo on his part agreed to bring in artists and production personnel of stature and competence and agreed to act in such a matter as to create an artistically sound and potentially profitable motion picture. In consideration of Entertainers' agreement to produce and finance the aforesaid motion picture, and to facilitate such production, Trumbo agreed to assign and convey to Entertainers all of his interests in the novel *119 and screenplay Johnny and the copyright of that novel and all of his interest in the song and copyright of "Song of the Freaks," which was included in and was a part of said screenplay. Harry deemed it necessary to transfer the United States distribution rights to the film Johnny from ABC to the Netherlands Antilles before being brought to the United States in order to take advantage of the tax treaty between the United States and the Netherlands. To accomplish this result, a "licensing agreement" drafted by Harry and Peterson was entered into on July 1, 1970, by Koningsplein and Entertainers[15] under which Koningsplein was granted a license to distribute the motion picture, Johnny, throughout the continental United States, Alaska and Hawaii. One version of this licensing agreement provided that television rights to the film were reserved to Entertainers and that the terms of the agreement was seven years. A second version of the same licensing agreement provided that the distribution rights included the right to show the film on television and that its term was *120 11 years. Both licensing agreements provided that Koningsplein should pay to Entertainers, as an advance against proceeds to be received on distribution of the motion picture, the sum of $2,200,000 to be paid as follows: (1) $350,000 to be paid upon execution of this agreement; (2) $350,000 to be paid on or before December 1, 1970; and (3) $100,000 per month to be paid commencing January 1, 1971, and continuing thereafter on the first day of each month until the total of $2,200,000 has been paid to Entertainers. Under the terms of this agreement Koningsplein's obligation to make the second and subsequent installment payments mentioned above and to release the "photoplay" [16] as provided above was contingent upon Koningsplein's approval of the photoplay as follows: (a) an authorized agent of Koningsplein was to be shown a rough cut of the photoplay on or before November 1, 1970; at that point Koningsplein could determine whether or not to make the second installment payment of $350,000 as provided above; if said sum was not paid by December 10, 1970, Koningsplein's rights would terminate; (b) an authorized agent of Koningsplein would be shown a completed photoplay by no later *121 than January 1, 1971; at that point Koningsplein would have the option of going forward with the contract and would evidence its intention to proceed by payment of the $100,000 installment described above; and (c) if Koningsplein failed to exercise this option on November 1, 1970, or January 1, 1971, its rights under this agreement would be terminated and all sums previously paid would be retained by Entertainers as liquidated damages. A portion of the agreement captioned "Distribution of Gross Revenue," provided that Koningsplein would receive 100 percent of the gross proceeds from distribution in which it was directly engaged or through the sub-licensing of the film by Koningsplein, until such time as Koningsplein had recovered such sums actually expended by it for prints and advertising and paid to Entertainers as consideration under the agreement. Thereafter, Koningsplein would retain 10 percent of the gross proceeds from the distribution in which it was directly engaged or through sub-licensing and the remaining 90 percent of the gross proceeds would be paid by Koningsplein *122 to Entertainers. "Gross Proceeds," for the purposes of this agreement was defined as all sums earned by the Photoplay as a result of its exhibition under license through Koningsplein, whether in theaters, homes or otherwise, less the cost of exhibition and distribution, provided only that such costs of exhibition and distribution were not to exceed 30 percent of the gross box office revenue of the Photoplay. If Koningsplein decided to enter into a distribution agreement which required an expenditure of more than 30 percent of gross revenue for the cost of exhibition and distribution, it had to first obtain Entertainers' consent in writing to such an agreement. A key distribution rights document prepared by Harry and Peterson for the Johnny venture was an agreement dated July 6, 1970 between Koningsplein and Popularch. Scope also assisted in the drafting of this document. It provided, in part, that distribution rights were granted to Popularch as a licensee to distribute throughout the continental United States, Alaska and Hawaii the motion picture Johnny. Under that arrangement, it could distribute, market and exhibit and otherwise use and deal with the Photoplay, including *123 the sound track, on any size film and by any other means of message, including theatrical and non-theatrical home and commercial purposes and for purposes of trade. It could also reproduce and perform the sound track of the Photoplay and all other sounds recorded in connection with it, independently or with the exhibition of the film itself and could use the sound track for the production of phonographic records and tapes for sale to the public. It was also permitted to advertise the motion picture by any and every means, thus exercising all rights, licenses and privileges of every kind which Koningsplein had or might acquire with respect to the motion picture or the literary or dramatic material on which it was based, including the names, voices and likeness of actors and other personnel involved in its production. It could also authorize and license others to exercise and sub-license any or all of Popularch's rights and licenses under the agreement. It could also make superimposed title versions of the motion picture in other languages which could not, however, be exhibited outside the continental United States, Alaska or Hawaii, without the express written consent of Koningsplein. *124 Television rights were included in the grant, either publicly or privately, by means of television tape or other forms of home viewing. Popularch's rights under the agreement commenced on the delivery of the negative suitable for making release prints or on February 1, 1971, whichever occurred later, and continued for a period of 11 years from that date. For the grants to Popularch as distributor, Popularch was obligated to pay Koningsplein a royalty for its license based on a percentage of all gross proceeds received by Popularch and arising from the distribution of the motion picture. Gross proceeds were defined as all sums earned by the motion picture, as a result of its exhibition under license through Popularch, in theaters, homes or otherwise, less such sums as retained by the exhibitors under the terms of their agreement with Popularch, and less actual costs to Popularch of prints, advertising, promotion and distribution for this purpose. To determine gross proceeds Popularch would be allowed its actual costs of distribution to a maximum of 30 percent of actual net box office proceeds, should Popularch enter into a sub-distribution agreement. Such arrangement was subject *125 to the approval of Koningsplein which could not be unreasonably withheld and Popularch would be allowed a credit for the purpose of computing gross proceeds equal to the distribution costs actually charged to Popularch. Gross proceeds as defined above would be divided as follows: 1) up to $2,400,000, Popularch 100 percent, Koningsplein zero; 2) from $2,400,00 through $4,000,000, Popularch 10 percent, Koningsplein 90 percent; 3) from $4,000,000 to $7,000,00, Popularch 25 percent, Koningsplein 75 percent; 4) from $7,000,000 to $10,000,000, Popularch 40 percent, Koningsplein 60 percent; and 5) in excess of $10,000,000, Popularch 50 percent, Koningsplein 50 percent. The foregoing distribution of gross proceeds did not include sums received from the sale of television rights which were to be the subject of a separate agreement. Popularch agreed to pay Koningsplein, as an advance against royalties, from the distribution of the motion picture, the sum of $2,400,000 to be paid as follows: (1) $650,000 to be paid within 30 days of execution of the agreement; and 2) $1,750,000 to be paid on or before February 1, 1971. Failure to pay any installment when due would be considered a breach *126 of the agreement and would terminate all of Popularch's rights thereunder and would cause a forfeiture of all sums already paid by Popularch to Koningsplein. Popularch also agreed to distribute the motion picture or cause it to be distributed in good faith, in accordance with the usual practice in the United States. If Popularch distributed the motion picture itself, it agreed to consult with Koningsplein with regard to plans for distribution, advertising, promotion, play dates and the manner in which the distribution was to be established. Finally, the agreement contained provisions relating to the "Right to Review Rough Cut." That provision stated that the obligation of Popularch to pay the first $650,000 to Koningsplein mentioned above, would arise and become fixed upon the execution of the agreement. However, the obligation to make any further payments under terms of the agreement would not arise until or unless representatives of Popularch viewed the rough cut of the motion picture and notified Koningsplein in writing of Popularch's desire to proceed with the agreement. Koningsplein agreed that a rough cut of the motion picture would be available for viewing by Popularch *127 no later than November 1, 1970. If a rough cut was not then available, Koningsplein would be deemed to have breached the agreement and would have to refund to Popularch all sums paid to Koningsplein together with interest thereon at 10 percent per annum from the date of payment to the date of repayment. If the film was available in rough cut by November 1, 1970, and Popularch did not exercise its option thereunder in writing on or before November 30, 1970, Popularch would be relieved of all further obligations under the terms of the agreement. In that event, Popularch would forfeit to Koningsplein $100,000 as liquidated damages, it being agreed that the actual measure of damages to Koningsplein was not otherwise capable of determination. Koningsplein would have to return the balance of $550,000 to Popularch without interest on or before December 21, 1970. On the other hand, if Popularch exercised its option, it would thereupon be obligated to make the payments set forth above. In August 1970, Campbell was approached by Owen McKlean (McKlean), Vice President of Twentieth Century Fox Corporation (Fox) in charge of talent. McKlean expressed an interest on behalf of Fox for distributing *128 Johnny when the film was completed. He made an oral offer of a $1 million advance against royalties for the worldwide distribution rights to Johnny. This proposal was confirmed by a letter dated August 19, 1970. It envisioned that after recovery of costs, (during which time Rich would receive 10 percent of gross receipts), fees for distribution by Fox would be 30 percent for the United States, Canada and the U.K., 37-1/2 percent for Europe and 40 percent for the rest of the world, with the remaining gross to be distributed half and half to Rich and to Fox. This written proposal was not accepted by Rich. Through February 19, 1971, none of the investors in Popularch had made any out-of-pocket investment in any phase of producing or distributing Johnny. Distribution of the film was itself a matter of some controversy and a number of individuals and various groups at various times negotiated for the right to distribute the film. Included were Lazarus, Campbell, Trumbo, Ben, Donner, Fischel, Breen, and others. The final choice of this right was controlled by Harry with the counsel and advise of Scope, Trumbo, Lazarus and Ben. Throughout this process it was insisted that the distribution *129 rights be held in the name of Popularch -- not Rich -- and that Popularch control that distribution. At first the only distributor to show an interest in Johnny was Fox and in March 1971 Ben, Scope, Trumbo and Lazarus met with representatives of Fox to negotiate concerning the distribution contract for Johnny. By April 1971, a written contract between Popularch and Fox had been negotiated by Ben and a representative of Fox. In these negotiations PMSA, holder of distribution rights to Johnny throughout the world, except for the United States, was a party to the negotiations and was represented by Ben. In these negotiations, Ben acted independently of the management of PMSA and did not communicate with them concerning these matters. Under the proposed agreement, the term for distribution was 10 years and the distributor was to pay to the producer (Popularch and PMSA) $800,000 as an advance against royalties and then 50 percent of gross receipts in excess of $2 million and 60 percent of gross receipts in excess of $6 million. The definition of "gross receipts" contained in the proposed distribution agreement referred to all monies paid to the distributor or its subsidiary companies *130 or its agents for the right to exhibit the picture, either in cash or in the way of credit on any obligation of the distributor and from the disposition of distribution, exhibition, and television rights therein.It did not include any money received from trailers, phonograph records, lithographs, slides and advertising, etc. This Fox distribution agreement envisioned that 45.51 percent of the gross receipts from the distribution of Johnny would come from the United States and thus $364,080 of the $800,000 advance against royalties was for the United States distribution rights. Fox in 1970 and 1971 had a full distribution organization worldwide which employed over 2,000 people and it had, therefore, a heavy overhead cost. As a distributor Fox supplied film for a number of theaters on a regular basis and it was usually engaged in seeking films for release and at least part of Fox's motivation in seeking the distribution rights for Johnny was to fill out its thin release schedule. The proposed distribution agreement with Fox was never made final because it was vetoed by Trumbo who had actual authority and control over the choice of distributors and Trumbo did not want Fox to distribute *131 the film. By document dated May 7, 1971, Rich assigned to Entertainers, on behalf of itself and ABC, Rich's interest in Johnny. This document was entitled Assignment of Rights. Trumbo finally chose to have Johnny distributed in the United States by Cinemation, Inc. (Cinemation), a smaller distributor. On June 12, 1971, a distribution agreement was entered into between Popularch, PMSA and Cinemation which was negotiated by Ben on behalf of Popularch and PMSA. In that agreement, the producer was described as both Popularch and PMSA. The distributor, Cinemation, was given the exclusive right to distribute the film Johnny in the United States, its territories, possessions and the Dominion of Canada. The distributor could use the film for theatrical and commercial purposes of any kind, non-theatrical purposes of any kind and television in all forms. The term of the contract was seven years with the proviso that if the "remaining gross receipts," as defined in the agreement, did not amount to $1,200,000 within a seven year period, that period would be extended for an additional three years. In the agreement "gross receipts" was defined as all money paid to the distributor, its *132 subsidiaries or agents or subdistributors, in cash or by credit arising from the lease, license, rental, dealings in and distribution of all rights granted with respect to Johnny. Security deposits of periodic payments were only to be reflected when earned or forfeited, while receipts from the sale of trailers and advertising were excluded from gross receipts. The agreement provided that gross receipts would be reduced by expenses incurred by the distributor for import duties and like charges, substantiated by out-of-pocket expenses directly related to advertising, promotion and publicity but not to exceed $150,000. Gross receipts remaining after these expenses, as well as the costs of auditing the books and records, were defined as "the remaining gross receipts." Under the contract, the sum of $450,000 was to be paid as follows: a) $50,000 upon execution of the agreement; b) the balance of $400,000 concurrently with "complete delivery of the picture"; c) distributors shall pay to Producer sums equal to 60 percent of all remaining gross receipts in excess of $1,200,000 of such remaining gross receipts except with regard to remaining gross receipts from Canada and remaining *133 gross receipts derived from the television exhibition of the Picture as to which Distributor shall pay Producer the sums set forth in subparagraphs (d) and (e) below; d) after remaining gross receipts from all sources (including Canadian receipts and television receipts) shall equal $1,200,000, distributor shall pay the producer 40 percent of all remaining gross receipts thereafter received from Canadian distribution of the Picture; e) after remaining gross receipts equal $1,200,000, the distributor shall pay the producer 90 percent of any television network sales and 65 percent of any television receipts from other than network sales. Harry and Peterson also drafted a document entitled "Licensing Agreement" which was dated August 5, 1970 between PMSA and Entertainers. This licensing agreement granted to PMSA a license to distribute the film Johnny worldwide, except for the United States, for a period of 11 years. It further provided that PMSA would receive 100 percent of the gross proceeds of such distribution and must pay 50 percent of such proceeds to Entertainers. It also provided that from the remaining 50 percent of the gross proceeds, PMSA would pay all costs of distribution, *134 prints, advertising and promotion and other expenses. Money received by PMSA for foreign distribution of Johnny was to be used to satisfy the obligations of Rich to IPS for production costs. (Sequel) The film Johnny opened with its premiere showing in New York on August 16, 1971, and a week later it opened in Los Angeles and Chicago. It quickly became apparent that the film would be a financial failure in the United States. On January 17, 1972, an agreement was executed between Popularch and Alms. It stated, among other things, that Popularch was indebted to Alms for $1,735,000, plus interest through December 31, 1971, in the amount of $219,133. Therefore, Popularch transferred to Alms as of January 1, 1972, all of its remaining interest in the U.S. distribution rights to Johnny. [17] Alms was to pay Koningsplein $100,000 due to Koningsplein from Popularch under the agreement between Popularch and Koningsplein of July 6, 1970; Alms would consider the receipt of the distribution rights as payment of $1,300,000 from Popularch, leaving a balance remaining due to Alms from Popularch (after applying the $100,000 check and the $1,735,000 [18] balance due to Alms from Popularch) of *135 $754,133, with no interest due if paid in full by Popularch by June 5, 1971. [19]
On or about July 3, 1972, $755,000 was transferred from the Anglo Dutch account at Barclays Bank of California to the Popularch account at the same bank. This transfer took the form of a loan to the individual partners of Popularch for which Anglo Dutch required neither guaranty, security nor collateral. On the same day $754,133 was transferred from the Popularch account at Barclays to the account of Alms at Banco Popular as payment of the balance due Alms by Popularch under the agreement dated January 17, 1972. Reflecting the foregoing agreement, the books of Popularch showed a loss on the sale to Alms of the United States distribution rights for Johnny of $526,780 in 1972. The cost of producing Johnny by Rich included cash of $741,635, accounts payable of $354,351.37 and deferments of $235,318.25 for a total $1,331,604.62. The record in this case fails *136 to show any payments of the accounts payable item or the deferments referred to above. In connection with the venture which produced Johnny, Ben or his law firm represented, from time-to-time, PMSA, Popularch, Alms, Entertainers, Rich and ABC. As late as November 10, 1970, various documents prepared and drafted by Harry, Scope and Peterson for the film venture, previously described above, had neither been put in final form nor executed. OPINION The principle issues for decision herein are whether the individual petitioners are entitled to deductions for their distributive shares of various deductions claimed by the partnership, Popularch, such as depreciation and interest and losses claimed to have been incurred by Popularch in the production and disposition of certain rights in the screenplay "Johnny." Since none of the petitioners were involved in an individual capacity in the transactions upon which these deductions and losses are claimed to have been based, we must examine the transactions at the partnership level. Popularch is a limited partnership formed to raise money for the production and distribution of a film, Johnny, based on a novel written by Dalton Trumbo entitled *137 "Johnny Got His Gun" first published in 1939. Efforts to interest established movie producers in making the film had proven fruitless until Simon Lazarus, a wealthy friend of Trumbo's in Southern California, became interested in 1970. Lazarus sought the advice of his attorney, Ben Margolis, who then involved Ben's brother, Harry Margolis, to investigate and plan how to raise the funds needed for the above purpose. Margolis decided that the funds could be raised from wealthy clients and acquaintances if the production and distribution of the film could be utilized as a tax shelter by the investors. Thus began the saga unfolded in our findings of fact. Respondent's principal argument asks the Court to ignore "the appearance of deductions for depreciation, interest, a loss and miscellaneous items that did not in substance exist," as related to the production and distribution of Johnny in forms created by Harry. No argument is made by respondent that the various entities involved had no true legal substance. Thus, the issues presented mostly raise questions of whether various transactions should be disregarded as lacking real economic substance. Procedural Matters
1. *138 The Baggot and Sells Issue and the Testimony of Reller and Lynch:
This issue is addressed first because it could require further proceedings in these consolidated cases. The Baggot and Sells[20] issue was raised first at trial, during petitioners' cross-examination of respondent's witness, Special Agent Nancy Reller (Reller), an IRS employee. On direct testimony, Reller had identified various exhibits consisting of bank records and bank statements which were received in evidence over objection of petitioners' counsel. These exhibits were described as having been obtained by her and Special Agent James Lynch (Lynch), another of respondent's witnesses, from two sources: (a) Banco Popular in Curacao, Netherlands Antilles, pursuant to a letter of competent authority issued under the United States of America/Kingdom of the Netherlands Tax Treaty, and (b) Union Bank in California. After an extended in limine series of questions by petitioners' counsel, further cross-examination of Reller with respect to the said bank records was barred by the Court as immaterial and exceeding the scope of direct testimony. *139 Petitioners' counsel then made an offer of proof to support his oral motion that the cases relating to all petitioners be dismissed under the authority of the Supreme Court cases of Baggot and Sells. His theory was that petitioners' cases had been irreparably contaminated by use of "matters occurring before the grand jury" which had indicted Harry Margolis in California in 1975 for tax fraud. Petitioners argued that the bank records were the "matters." Petitioners also moved (1) to suppress the testimony of Lynch and Reller as well as the exhibits they had identified and, (2) to reopen the trial for continued cross-examination of Reller by petitioners as to the sources of the information used before the grand jury and the relationship of the records already received in evidence to the grand jury proceedings. Petitioners' motions were taken under advisement, and the Court directed counsel to brief this matter. In their reply brief petitioners assert that the IRS "may have improperly used grand jury documents or processes" to determine the civil income tax liabilities at issue in the present cases. Therefore, petitioners argue, "no findings of fact, conclusions of law *140 or inferences of any kind, may be based on or drawn from the testimony of Lynch or Reller, or the exhibits to which they testify. The case should be reopened for the continued examination of Ms. Reller and the development of the issues in light of the Supreme Court doctrine, which are directly applicable to this case." From the foregoing, we conclude that petitioners have now abandoned their contention that the Popularch adjustments should be dismissed as to all petitioners. Consequently, we have nothing to rule on so far as dismissal is concerned. Testimony of Reller and Lynch
Both Reller and Lynch were, during the taxable years at issue and at the time of trial, special agents employed by the IRS. In 1970 Lynch was assigned to the Intelligence Division, Office of International Operations. In connection with Project Haven, involving offshore tax havens in the Netherlands Antilles, Lynch went to Curacao in June and November of 1974. Acting under a letter of authority issued by the director of the Office of International Operations (who was designated to act as the U.S. Competent Authority under the United States/Netherlands Tax Treaty, 122 U.S.T. (Part 1) 247, *141 T.I.A.S. 7061), Lynch, with the knowledge, consent and permission of the Netherlands Antilles government, and in the presence of Joseph Webster, auditor for that government, was given access to and microfilmed various bank records and statements of Banco Popular in Curacao. These related to Alms, Minerals, Koningsplein, ABC, Entertainers and PMSA, all for the years 1971-1973. Records of other taxpayers were also made available and copied. In June 1974, and February 1975, Reller also went to Curacao to continue the process of microfilming various Banco Popular records of the same entities. The materials gathered by Lynch and Reller in Curacao were the product of an IRS investigation made prior to and independent of a subsequent grand jury investigation of Harry. The materials were obtained under a Competent Authority letter. Those same materials were later turned over to the grand jury for its consideration of whether to indict Harry. Reller subsequently testified before the grand jury, and Harry was indicted on October 6, 1975. After a lengthy criminal trial he was found not guilty of the charges against him. At the conclusion of the trial the records described above, which *142 had been obtained by Lynch and Reller, were returned to the Internal Revenue Service for use in connection with other civil tax audits not directly relating to Harry's personal tax liability. [21]
Records obtained from Banco Popular also led to a second group of documents involved here, kept at the Union Bank in Los Angeles. A number of accounts were maintained by at least some of the above identified entities at Union Bank. Reller had, under an IRS summons, obtained various Union Bank records in connection with the original civil tax audit of the Project Haven matters prior to the commencement of the grand jury's investigation. During the course of Harry's criminal trial, Reller was called as a prosecution witness and identified some of these Union Bank records. After the conclusion of Harry's criminal trial and his acquittal, the materials used in that trial were segregated and those originating *143 with the IRS were returned to the IRS for other civil cases not directly involving Harry's personal tax liability. Respondent, here, did not deem it necessary to request, and did not obtain, an order under Rule 6(e), Fed. Rules of Criminal Procedure, before using the materials in question in these consolidated cases. Turning to the Baggot and Sells cases themselves, they were concerned with exceptions to Rule 6(e), which generally prohibits disclosure, by persons necessarily involved in grand jury proceedings, of matters occurring before the grand jury. Rule 6(e)(2) provides generally for secrecy of grand jury matters, except as otherwise provided in the rules. Rule 6(e)(3) provides certain exceptions to the general rule. Paragraph (A) thereof provides that disclosure otherwise prohibited by this rule may be made to (1) an attorney for the government for use in the performance of his duties, and (2) government personnel deemed necessary by a government attorney to assist him in his duty to enforce Federal criminal law. Paragraph (C) provides in part that disclosure otherwise prohibited by the rule may also be made when so directed by a Court preliminary to or in connection *144 with a judicial proceeding. The Sells case held that disclosure of grand jury matters to attorneys for the Civil Division of the Department of Justice and their assistants for use in a civil suit is permissible only with a court order under Rule 6(e)(3)(C)(i), Fed. Rules of Criminal Procedure, based on a strong showing of particularized need for the materials as provided in Rule 6(e)(3). In Baggot the Court held that an IRS civil tax audit is not preliminary to or in connection with a judicial proceeding within the meaning of Rule 6(e)(3)(C)(i) so that disclosure for that purpose was not permissible. In these cases, there was no order or request for an order for the use of matters occurring before the grand jury. We simply confront the basic question of whether any of the exhibits offered and received in these cases or any testimony offered was obtained by the processes of, or were "matters occurring" before, the Harry grand jury. If they were, then the requirement is clear that they may not be disclosed here and whatever additional steps necessary to preserve their secrecy must be taken. We hold that they were not such "matters" for the reasons set out below. The *145 present cases are factually similar to In Re Grand Jury Matters,682 F.2d 61 (3d Cir. 1982). In that case, information was transmitted to the district attorney consisting of materials obtained in the course of an FBI investigation of possible unlawful activity, including tape recordings, transcripts and a prosecution memorandum summarizing the information compiled by the FBI. The Court found that the materials were a product of an FBI investigation and were not generated by the grand jury. Therefore, it held that this was not information "occurring before a grand jury," and, hence was outside the disclosure ban of Rule 6(e), Federal Rules of Criminal Procedure. This was true even though the information gathered by the FBI was developed with an eye towards ultimate use in a grand jury proceeding; the information existed apart from and was developed independently of grand jury processes. "The disclosure of information, in a civil action, which was obtained from a source independent of the grand jury proceeding, such as a prior government investigation, does not violate Rule 6(e)." In Re Grand Jury Investigation,610 F.2d 202, 217 (5th Cir. 1980). *146 The mere fact that a particular document is reviewed by a grand jury does not convert it into "a matter occurring before the grand jury" within the meaning of Rule 6(e). McArthur v. Robinson,98 F.R.D. 672, 677 (D.Ark. 1983); United States v. Fischback and Moore, Inc.,576 F. Supp. 1384, 1395 (W.D. Pa. 1983). We believe this rule applies here. Sisk v. Commissioner,791 F.2d 58 (6th Cir. 1986). For the reasons set out above, we conclude that petitioners' motion to suppress must be denied. The motion to reopen the trial for further cross-examination of witness Reller is also denied. 2. The Rule 91(f) Matter
This procedural matter involves Rule 91(f), relating to respondent's motion to compel stipulation, and petitioners' assertion that the motion fails to meet the standards of Rule 91(f)(1)(iii) and (iv). Petitioners did not mention this matter in their opening brief; they did discuss it in their reply brief. In 1979, most of these consolidated cases were moving toward trial before Judge William Quealy. A pretrial hearing was held on September 13, 1979. On October 18, 1979, respondent submitted a proposed stipulation *147 of facts to petitioners consisting of 464 paragraphs which was 67 pages long. Counsel for most petitioners then was Harry, who responded promising full cooperation but not agreeing to a single stipulation. Thereafter, these cases became dormant upon the retirement of Judge Quealy early in 1980. They were later reassigned to Special Trial Judge Tansill for trial or other disposition. On August 15, 1983, the Court notified the parties by letter that the Popularch issues would be set for trial shortly after January 1, 1984, in San Francisco. The letter also requested confirmation of docket numbers containing Popularch adjustments by August 31, 1983, and it also requested separate written status reports from each party as to the following by November 30, 1983: (1) Efforts to settle the controversy; (2) Alternatively, progress in stipulating facts; (3) Possibility of trying one test case with all other parties stipulating to be bound by the result therein; (4) Estimated trial time; (5) Any changes in representation; and (6) Any anticipated pretrial motions to be filed. By order of September 15, 1983, the Court severed the Popularch issues in all the indicated docket *148 numbers and consolidated the severed issues for trial, briefing and opinion. This order also reiterated the six points mentioned above, adding an additional query as to the possibility of designating a lead counsel with all other parties agreeing in writing to defer to that counsel. Respondent filed a timely status report dated November 29, 1983; none was filed by any petitioner. Respondent's report stated that there was no basis for settlement, no stipulation of facts, no possible test case and no lead counsel; trial time was estimated at two weeks; respondent was unaware of any changes in representation or of any specific pretrial motions. On December 14, 1983, Harry filed a written status report, 14 days late, in which he indicated he planned to withdraw as counsel to be a witness [22] as soon as a replacement was obtained; he did not believe that a stipulation of facts "will be possible." Harry was not sanguine as to selection of a lead counsel and assumed the possibility of pretrial motions. *149 By order of December 12, 1983, the severed and consolidated Popularch issues were set for trial in San Francisco at a special session commencing on February 13, 1984, the Court stating that it "does not anticipate any continuances or postponements with regard to the February 13, 1984, trial date." Finally, the parties were ordered to file on or before February 1, 1984, a stipulation of facts pursuant to Rule 91(a) or, alternatively, a motion for a show cause order pursuant to Rule 91(f), "leave for the filing of which will be granted." The quoted language refers to the time constraints which would not be permitted to preclude an otherwise proper motion due solely to the time limitations of Rule 91(f). See Rules 91(f)(1) and 25(c). No stipulation of facts was filed by February 1, 1984. Respondent filed a Motion to Show Cause on February 8, 1984. The motion was directed to an attached stipulation of facts proposed by respondent (Exhibit A to the Motion) which contained 414 numbered paragraphs. Exhibit B to the Motion was a listing showing "Source and Location of Evidence," referring to the exhibits supporting Exhibit A. The listing was preceded by the statement: "(Unless otherwise *150 stated all paragraphs are supported by documents which are attached to Exhibit A.)" Then followed a list of 414 exhibits most of which were described as "In possession of Harry Margolis"; some were described as in possession of other named individuals or banks. The listing concluded as follows: "All documents which are indicated to be in the possession of Harry Margolis were obtained by respondent from Harry Margolis. Those documents which were obtained by respondent from another source are within the personal knowledge of Harry Margolis." Paragraphs 32 and 372 through 391 of the proposed Stipulation of Facts cite as a source "Harry Margolis' personal knowledge." The foregoing summary contains all that respondent offered in the proposed stipulation as to the "sources, reasons and basis for claiming, with respect to each such matter, that it should be stipulated." See Rule 91(f)(1)(iii) and compare (ii) and (iv). By letter of December 30, 1983, respondent invited all petitioners' counsel of record at that time to meet in his office on January 18, 1984, to discuss stipulations of facts.Only one counsel appeared (Leonard Binder, attorney for Linda Torgan in docket No. 5336-75). *151 Harry did not appear. Respondent's motion of February 8, 1984 prayed for a hearing at the earliest convenient date prior to February 13, 1984, with respect to the show cause order, if petitioners did not agree to accept as established the facts set out in Exhibit A. When the case was called for trial in San Francisco on February 13, 1984, petitioners (all then represented by Robert Dunnett with the simultaneous withdrawal of Harry), filed a response to the order to show cause setting forth reasons why the matters set out in respondent's stipulation of facts should not be deemed admitted for the purposes of the pending cases. The response "admitted" some allegations, "denied" some (for inability to verify) and "objected" to many. Simultaneously, Harry filed a Declaration referring specifically to proposed stipulation paragraphs numbered 32 and 372 through 391, which respondent had attributed to the "personal knowledge of Harry Margolis" as a source. His comments range from "no knowledge," "inaccurate," "untrue," "wrong," "invidious" and "misleading," to "accurate" and "essentially correct." After a two and one-half day hearing on the show cause order, the parties filed a signed *152 stipulation of facts with petitioners' objections noted therein. The principle thrust of petitioners' objections were: a) The moving party (respondent) has not "set forth the sources, reasons, and basis for claiming with respect to each such matter that it should be stipulated" as required by Rule 91(f)(1)(iii); b) It is improper to cite as a "source" Harry's "personal knowledge;" and c) Opposing counsel have not had "reasonable access" to all the sources or bases for stipulation and have not been informed of the reasons for stipulation, as required by Rule 91(f)(1)(iv). It is obvious from the above and the record in these consolidated cases that they are old, complex cases that should be disposed of as soon as possible with fairness to both parties. Harry was lead counsel for petitioners for almost five years until he withdrew as counsel several weeks before trial. Harry and his office staff had planned and directed all of the transactions involved in the production and distribution of "Johnny" and had prepared most of the paper work. They either controlled or worked closely with all of the institutions and their responsible officers that were involved in the various transactions. *153 In short, we believe Harry was more knowledgeable and better aware of all of the sources and the documents referred to in the stipulation than anyone else. We are convinced that all of this information was readily available to the attorney who replaced Harry as counsel for petitioners several weeks before the trial. We realize the stipulation and exhibits proposed by respondent were numerous and quite extensive for the new counsel to become acquainted with in the short time between the time he filed an appearance and the pretrial hearing on the show cause order. However, substitution of counsel may be made only with approval of the Court and is not necessarily grounds for a continuance. In this case the parties were advised in 1983 that the case would be set for trial in early 1984. Counsel for petitioners made no effort to consult with respondent's counsel with regard to stipulations, despite the fact that respondent had presented petitioners' counsel with a proposed stipulation of facts, quite similar to the one received in evidence here, in 1979. It was quite apparent that in-depth stipulations were necessary to present this very complex case to the Court in a reasonable *154 length of time. Most of the matters contained in the stipulation as filed were based on documents and facts that were quite familiar to Harry and could have been explained to replacement counsel by Harry and his staff, if necessary. We believe that under these special circumstances there was substantial compliance with Rule 91 by respondent. We do not believe petitioners were surprised by any of the matters contained in the stipulation -- at least they have not specifically so indicated. We do not find petitioners' objections to the stipulations well founded under the circumstances. For petitioners' new counsel to raise technical objections of the sort indicated, which could only be based on the last minute substitution of counsel, suggests a pre-arranged trial strategy. We believe that justice will best be served in this case by rejecting petitioners' objections to the stipulation and receiving the stipulations in evidence in this case. We so hold. [23]
The Tax Issues
3. Whether Popularch may properly deduct $473,220 of depreciation *155 in 1971 with respect to the domestic distribution rights to Johnny?
This issue arises from respondent's determination, which is presumed to be correct, Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a), that the depreciation deduction for the movie distribution rights to Johnny of $473,220, claimed on the partnership information return of Popularch for 1971, should be disallowed. Three reasons [24] for the disallowance were advanced in the statutory notice. One of them was based on the failure of Popularch to establish that the basis of $2.4 million claimed for the Johnny distribution rights should be recognized as bona fide for tax purposes.
The petitions filed by the partners of Popularch in response to the disallowance of depreciation described above, all perfunctorily controvert the disallowance in the same terms used by respondent, without embellishment or significant addition. Thus, the pleadings have framed as an issue in failure of Popularch to prove its tax basis *156 in the domestic movie distribution rights (distribution rights) for Johnny. Under Rule 142(a), the burden of proof of this matter rests on petitioners. Section 167 allows as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear of property used in a trade or business or of property held for the production of income. Factors taken into consideration in computing the deduction are the basis of the asset and its useful life. Section 1012 provides that the basis of property shall be its cost, with certain adjustments. Section 167(b) provides that the term reasonable allowance shall include in allowance computed by various methods that would allow the owner to recover the cost of the asset over its useful life. Here, Popularch, and hence petitioners, claimed deductions for depreciation of an asset, being the domestic distribution license for Johnny for 11 years, using as its cost basis $2,400,000 and as the method of depreciation the income forecast method. This resulted in a depreciation deduction claimed by Popularch on this asset of $473,220 in 1971. Petitioners contend that the substance of the transaction is the same as its form and that the form *157 of the asset acquisition clearly supports the figure they used. Respondent argues that petitioners have not carried their burden of showing "true cost" of the asset. Alternatively, respondent contends that the value of the preproduction distribution rights to Johnny in 1971 was no more than $100,000, although after production was complete, Fox offered $364,080 and Cinemation paid $450,000 for the distribution rights. Section 1.1012-1(a), Income Tax Regs., defines "cost" as "the amount paid for such property in cash or other property." Thus, our concern here is to find what amount of money Popularch paid for the domestic distribution rights to Johnny. For reasons discussed in detail hereafter we conclude and hold that Popularch a) really paid nothing of economic substance to acquire the distribution rights to Johnny, and b) acquired the apparent rights to Johnny through a series of sham transactions lacking true economic substance which must be disregarded.The end result under either analysis is a zero basis for Popularch in the Johnny rights. The first of these points will be referred to as "circular money movements" and the second as "sham transactions. *158 " a) Circular Money Movements.
At the start, it is necessary to understand the general tax-planning script evolved by Harry and his assistants. The film Johnny would be cast, filmed and produced in California by an entity (Rich), which would be foreign-controlled and owned (ABC). Film ownership of Johnny would be in a Bahamian joint venture between ABC (to supply financing) and Entertainers (to provide talent). The completed film was to be delivered to the joint-venturers. Entertainers/ABC as joint venturers would grant a license to Koningsplein (corporate parent of ABC) for 11 years to distribute the film Johnny in the continental U.S., Alaska and Hawaii. Koningsplein, a Netherlands Antillean corporation, then would license the U.S. domestic distribution rights to Popularch for 11 years. Foreign distribution rights would be transferred to PMSA, another foreign entity. These maneuvers were carried out as planned. Leaving aside for the moment the prices which were charged for the distribution rights, the basic tax result was to have the income from Johnny essentially escape U.S. taxation, although it was conceived, filmed, produced and marketed (primarily) in this country. *159 Turning to the cost of the distribution rights to Popularch, under an Agreement of July 6, 1970 with Koningsplein, Popularch agreed to pay Koningsplein $2,400,000 in advance royalties for the right to distribute the film throughout the continental United States, Alaska and Hawaii. (Both Koningsplein and Popularch are system entities.) Under that Agreement, Popularch was required to pay $650,000 within 30 days and the balance of $1,750,000 by February 1, 1971. To implement this Agreement, three separate scenarios were planned and carried out. To raise the $650,000 first payment, Popularch borrowed $350,000 on July 21, 1970 from Anglo Dutch (a domestic system entity) and $410,000 on July 23, 1970 from Union Bank, Los Angeles. Of the latter amount, $100,000 was required by the Bank to be kept as a minimum balance; thus, there was $310,000 available to Popularch from that source. It had, therefore, $660,000 of net available funds to make the $650,000 payment to Koningsplein due by August 6, 1970, which it did on July 29, 1970. The Anglo Dutch transfer of $350,000 mentioned above, had been authorized by Harry's office accountant to Popularch on July 14, 1970 as a "circulating" *160 fund. "Circulating" meant that the funds in question remained in the "system." (Anglo Dutch to Popularch). While a note was given to evidence the "debt" to Anglo Dutch, there was no guaranty, no security and no collateral required of Popularch, which had been formed only on March 1, 1970 with very limited capital. Interest was payabel quarterly at 10 percent per annum; if interest was not paid when due then the principal became due at the option of the lender. The due date of that note was January 20, 1971. The Union Bank loan of July 23, 1970 was for $140,000 at 10 percent per annum, interest payable monthly. The loan was due on demand or if there was no demand then it was due in 180 days, subject to one renewal. It was payable at $50,000 per month for five months with a final payment of $160,000. (Of this sum, the minimum account balance would supply $100,000.) Notably, all the investors in Popularch, as well as ABC for its trusts, were required to guarantee the Union Bank loan. All debts owed by Popularch partners to system entities had to be subordinated to Union Bank. This was a transaction at arm's-length with a non-system entity. On July 29, 1970 Popularch transferred *161 $650,000 from its account at Union Bank to Koningsplein's account at Banco Popular in Curacao; this was accomplished by two separate transactions -- one of $250,000 and the other of $400,000. In anticipation of these payments, In der Rieden, president of both Kongsplein and Alms, sent a memo to Banco Popular on July 22, 1970, with instructions that the $400,000 payment was to be transferred to the account of Alms and the $250,000 was to be transferred to the account of ABC when received. These transfers took place as instructed on July 29, 1970. It is noted that several of the money movements described above occurred on the same day -- July 29, 1970. We also note that no explanation for the division of payments has been offered. These are all money movements between system entities.Also on July 29, 1970, at the instruction of In der Rieden, the $400,000 in the Alms account at Banco Popular was transferred to Anglo Dutch's account at Union Bank. In summary, $350,000 went to Popularch from Anglo Dutch, then $400,000 went from Popularch to Koningsplein, to Alms and back to Anglo Dutch. This is a circulating money movement within the system made by system entities. The first *162 critical fact for basis purposes is the payment of $650,000 by Popularch to Koningsplein. The fact that Anglo Dutch was more than effectively reimbursed [25] by the Alms payment militates against the idea of any actual cost to Popularch arising from the $400,000 payment to Koningsplein and we so hold. In so holding we are not unmindful of the seeming discrepancy of $50,000. Taken in the context of the elaborate and detailed planning evident here we regard it as nonsignificant. As Judge Hall said in Goldberg v. United States, an unreported case ( C.D.Cal. 1984, 55 AFTR 2d 85-1293, 85-1294, 85-1 USTC par. 9252 at 87,544): Margolis transactions are characterized by convoluted transfers of overvalued property rights, circular money movements among foreign trusts, delayed drafting, signing and back dating of documents, and client oblivion to the financial realities of their investments. Obfuscation of the facts behind offshore trusts is Margolis' primary shield from taxation. * * * Moving *163 now to the $250,000 item, on July 29, 1970, In der Rieden telephoned and confirmed in writing, instructions to Banco Popular to transfer the $250,000 from ABC's account to Rich's account at Union Bank. Thus, this money movement went from Popularch to Koningsplein to ABC to Rich. Technically, this sum did not return to Popularch, giving full effect to the form employed by the parties. It was labeled as a capital contribution by the parent (ABC) to its subsidiary (Rich). This seems plausible given the costs of filming and producing Johnny. We do not, however, include this item of $250,000 in Popularch's basis under the circular money movement approach as is discussed below with reference to repayments during the first 6 months of 1971. The next scenario affecting the tax basis of Popularch occurred in late November 1970 and also grew out of the agreement of July 6, 1970 under which Popularch agreed to pay Koningsplein $1,750,000 by February 1, 1971. (The actual amount to be paid was $100,000 less than was due by February 1, 1971 and the payment of the smaller amount ($1,650,000) would leave a balance remaining of $100,000 owed Koningsplein.) This payment was achieved by the following *164 circulating money movements. On November 24, 1970, Alms loaned $2 million to Popularch with interest payable at 10 percent per annum. If the interest was not paid when due then both principal and interest became due at that time. The note evidencing this obligation did not state when these payments were due and there was no guaranty, no security and no collateral for this large loan to Popularch. Thus, on November 25, 1970, Alms transferred $2 million from its account at Banco Popular to Popularch's account at Union Bank. Popularch then transferred $1,650,000 from its Union Bank account to Koningsplein's account at Banco Popular; the same day Koningsplein transferred the $1,650,000 amount back to Alms. At the same time, Popularch transferred $350,000 from its Union Bank account to Anglo Dutch's account at the same depository. This transfer had been preplanned, as evidenced by a letter from Fischel to Union Bank dated November 20, 1970, authorizing this transfer. In Harry's office this transfer was designated as a circulating item. This latter payment was ostensibly in repayment of the loan by Anglo Dutch to Popularch on July 21, 1970. Because the $1,650,000 movement from *165 Popularch to Koningsplein to Alms had its genesis in a $2 million loan from Alms to Popularch the same day, worth noting is the fact that Anglo Dutch simultaneously made two transfers to Alms, one of $150,000 and the second of $300,000. On November 25, the same day as all of the other transactions, Anglo Dutch transferred another $185,000 to Alms. While there is no relevant explanation for all of the Anglo Dutch transfers to Alms, it is obvious that Alms had received back all of the money it had initially transferred to Popularch. Popularch and Koningsplein were neither richer nor poorer than before the circulating money movement between the various system entities. Alms had provided the funds ($2,000,000), part of which were used by Popularch to pay Koningsplein $1,650,000, and the same day the same sum was returned to Alms by Koningsplein. Popularch also paid the remaining $350,000 of the loan from Alms to Anglo Dutch on the same day. Because of the circulating money movement this does not represent a true cost to Popularch expended for the purchase of distribution rights of Johnny in the United States. We now reach the third scenario. On January 17, 1972, Popularch was indebted *166 to Alms in the amount of $1,954,133 which consisted of $1,735,000 of principal plus $219,133 of interest thereon. Additionally, Popularch still owed Koningsplein $100,000 which arose out of the $2,400,000 sales price, less payments of $650,000 and $1,650,000. For this scenario Alms would pay Koningsplein the $100,000 which Popularch owned it; Popularch would get cash of $754,133 from Anglo Dutch and then transfer that amount to Alms, which would then give it back to Anglo Dutch.This would leave a balance of $1,300,000 that Popularch owed Alms; this is determined by adding $1,954,133 plus $100,000 to be paid to Koningsplein, less the payment with monies from Anglo Dutch of $754,133. On or about June 29, 1972, another money movember within the system was orchestrated from Harry's office in a category indicating that it was "circulating." To carry out this program on June 29, 1972, Harry signed a letter authorizing Barclay's Bank in California to transfer $755,000 from Anglo Dutch's account to Popularch's account at Union Bank. This transaction was accomplished on July 3, 1972. Harry's office then caused Popularch to transfer $754,133 to Alms as a circulating money movement. The *167 latter money movement was for the stated purpose of settling the balance due to Alms by having the cash transferred, plus the transfer from Popularch to Alms of all of its remaining U.S. distribution rights to Johnny in discharge of its outstanding indebtedness of $1,300,000 to Alms. On July 3, 1972, Alms transferred $350,000 to Anglo Dutch as well as $544,551 to ABC. Also on July 3, 1972, ABC transferred $205,294 to Anglo Dutch. At the conclusion of all these movements Popularch still owned Alms $1,200,000 ($1,954,133 minus $754,113) and owed Koningsplein $100,000. At this point, a special bail-out technique was applied by Harry. Recognizing that Popularch's debts to Alms approximated $1,300,000 (including the $100,000 Alms had agreed to pay Koningsplein for Popularch), it was proposed that Popularch transfer all of its remaining rights to domestic distribution of Johnny to Alms in full satisfaction of that outstanding debt. This was reflected as a sale by Popularch to Alms of these rights, allegedly establishing a loss on the sale of the U.S. distribution rights to Johnny of some $526,780 under section 1231. The Agreement reflecting this bail-out was dated January 17, 1972; *168 this must have been a back dating, as the culmination of these series of transactions occurred in June or July of 1972. The loan from Anglo Dutch to Popularch had no economic reality. It was unsecured and the law firm's authorizations indicated that this was to be a circulating money movement with Anglo Dutch getting back the money it had loaned almost to the precise penny. When Popularch received its original loan from Anglo Dutch of $755,000 it immediately turned it over to Alms who turned over $350,000 to Anglo Dutch and $544,551 to ABC. A portion of the amount transferred to ABC ($205,294) was then moved back to Anglo Dutch which, together with the sum from Alms ($350,000) totaled almost precisely the amount Anglo Dutch had originally disbursed. On January 18, 1971, Popularch renegotiated its loan payment arrangements then outstanding with Union Bank. Under the new arrangements, Popularch was to pay a total of $360,000 at the rate of $50,000 for 4 months starting in March 1971 and $160,000 in the fifth month. A part of these payments were actually provided for in the following fashion from system entities. On February 22, 1971, Alms loaned $50,000 to Popularch with interest *169 at the rate of 10 percent without collateral or guarantees and no maturity date; on February 26, 1971, Alms transferred $50,000 from its account at Banco Popular to the Popularch account at Union Bank. On March 25, 1971, Anglo Dutch transferred $50,000 to Minerals; on March 25, 1971, Minerals transferred $50,000 to Alms. The same day Fischel executed and signed a note whereby Popularch borrowed $50,000 from Alms at 10 percent per annum interest, payable annually until the principal was paid off. On March 25, Alms then transferred $50,000 to Popularch. On April 23, 1971 Popularch paid Union Bank Two separate checks, one for $40,000 and one for $50,000. These were payments of principal on the loan. In addition, on April 28, 1971, $50,000 was transferred from Minerals' account at Banco Popular to Popularch's account at the Union Bank. This transfer was evidenced by a promissory note of April 30, 1971, in favor of Alms rather than Minerals. On June 6, 1971, $40,000 was transferred from Minerals' account at Banco Popular to Popularch's account at Union Bank. This transfer was evidenced by a promissory note of June 6, 1971, in favor of Alms rather than Minerals. On July 21, 1970, Fischel *170 executed a note on behalf of Popularch which evidenced a loan received from Alms of $60,000. No due date was stated. On July 22, Alms transferred $60,000 to Popularch. All of these transfers to Popularch aggregated $250,000. [26] There is no explanation in the record of How Minerals or Alms received their funds, or whether Popularch ever paid any of these note obligations. We conclude and hold that these money movements were part of a circulating money movement which began when Popularch transferred $250,000 to Koningsplein on July 29, 1970. Because Popularch received back the full benefit of the $250,000 it had paid Koningsplein, this amount does not represent a true cost to be included in the Popularch basis for the U.S. distribution rights of Johnny. Based on the foregoing, we conclude that none of the $2,400,000 paid by Popularch was in substance a cost basis properly attributed to the purchase of U.S. distribution rights of Johnny by Popularch. Concluding this discussion of money movements, we note that even if *171 Popularch was entitled to any deduction for depreciation, interest or bad debts, the partners' distributive share of these deductions would be limited to their tax bases in the partnership at the end of the year in which the loss occurred. Section 704(d). In July 1970, the partners (in the aggregate) had a basis of $410,000 in the partnership because of Union Bank's loan of $410,000 to Popularch which increased the partners' share of liabilities of the partnership. Section 752(a). In 1971, the loan from Union Bank was paid back; therefore, the partners' (in the aggregate) basis in the partnership was zero, since the repayment decreased each partner's share of the liabilities of the partnership. Section 752(b). No other liabilities appear. Six partners contributed $6,250 each to the partnership in 1971. They were: Edward A. Atmore, Walter M. Kearns Jr., Sippi Nazarian, Genevieve Torgan, Hillard Torgan, and West Bay Investors. These partners' individual bases are increased by their cash contributions. Section 722. Therefore, for 1971 these six partners have a basis in the partnership equal to $6,250, plus their pro rata share of $2,650 ($452,650 of royalties paid by Cinemation *172 to Popularch, less $450,000 transferred from Popularch to Alms). Each of the other partners' basis in the partnership for 1971 is his or her pro rata share of the $2,650 item. [27]
We do not recognize any transfers from Alms, Anglo Dutch, or any other system entity to Popularch as true loans which would increase the partners' bases in their partnership interest, since these transfers were shams as we will now discuss. b) Sham Transactions.
Respondent argues that the facts and circumstances surrounding the purported transfer of the U.S. distribution rights in Johnny were nothing more than a series of sham transactions. Petitioners deny this and argue that the form of the transactions was real and had substance. After reviewing the entire record before us, we are convinced that respondent is correct and we so hold. We have already adverted to the circulating money movements as dispositive of the questions of lack of a cost basis for depreciation and loss purposes. Conceptually, *173 such money movements can also be regarded as shams, perse, within the broad sweep of that concept. Nevertheless, we next move to other sham considerations which we find equally supportive of a conclusion that all the Popularch deductions in controversy must be disallowed. These considerations include transactions devoid of economic substance, inflated prices for investments which are transferred by convoluted transactions, absence of arm's-length negotiations, back-dating of documents, general disregard of clients and other associates of Harry to financial realities, use of a series of artificial and unnecessary transfers to step up tax bases and, most importantly, Harry's control over all system entities and transactions. In Falsetti v. Commissioner,85 T.C. 332 (1985), we held that the purported sale of an apartment building was a "sham in substance." We defined "'sham in substance' as the expedient of drawing up papers to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits." 85 T.C. at 347. Our finding of sham in substance in that case was based on an absence *174 of transfer of a legal title or other indicia of arm's-length dealing, drastically inflated "sales" price, and complete disregard for the contractual terms by the parties to the purported sales. [28]
Here, the particular circumstances surrounding the sales in issue show that the transactions lacked economic reality. In all transfers of the distribution rights (except the sale to Cinemation), Harry's law firm and Ben's law firm represented both parties; they executed each contract on behalf of both buyer and seller; and set the terms of the purchase, including price. We find as a factual matter that the fair market value of the U.S. distribution rights for Johnny was grossly overvalued. We base this on testimony of respondent's expert witness, Max Youngstein, and the $450,000, (plus *175 60 percent of gross receipts above $1,200,000) price Cinemation paid for the worldwide distribution rights to Johnny. (Note that Popularch only owned the U.S. distribution rights.) The U.S. distribution rights had a fair market value of no more than $1,000,000 when Popularch purportedly purchased them from Koningsplein for $2,400,000. Petitioners did not have the distribution rights appraised before they purchased them. Generally, petitioners knew very little about their partnership's financial activities, but instead relied implicitly on Harry. The transfers of the distribution rights (except the sale to Cinemation) were all between system entities effectively controlled by Harry. These transfers as well as all other transactions between system entities (such as loans) were not at arm's length and were sham. We find as a factual matter that all of the sale documents were executed in July 1970 (except the sale of rights to Cinemation and PMSA), and that they were backdated to make them look like transactions that were occurring over time and the value was increasing over time. This documentation was simply "window dressing." The paperwork Harry created was so confusing that *176 Cinemation demanded estoppel letters by each party in Popularch and PMSA's chain of title.These estoppel letters were obtained by Harry. Petitioners have simply failed to prove Popularch's (and their own) basis in the domestic distribution rights in Johnny. Nor have they proved that any of the purported obligations Popularch incurred in connection with the acquisition and distribution of those rights were real or had any economic substance. The paper bank transfers and notes signed in behalf of Popularch appear to have been made simply for book purposes whenever it became necessary to support either a payment of an indebtedness or the purchase of an asset. There is no proof that any money actually changed hands or that any of the obligations purportedly incurred were real. The transactions were planned for tax purposes and a facade for tax purposes is all they accomplished. We recognize that the photoplay Johnny cost someone something to produce, but there is no evidence that Popularch ever became obligated to pay those costs. Popularch entered into an agreement to pay a certain amount for the rights to distribute the film in the United States but there is no proof that it *177 actually paid that amount or exercised the right. Its only payments were by use of the circular movements of money between related entities contrived by Harry. The circular money movements themselves also require the conclusion that the sales in issue were shams. They demonstrate that no true payments were made by any system entity involved to another system entity. The facts and circumstances surrounding the purported sale of the U.S. distribution rights in Johnny demonstrate that the alleged transactions were nothing more than a culmination of a series of transactions devoid of economic substance. Petitioners have failed to carry their burden of proving otherwise. Accordingly, Popularch, and hence petitioners, are denied deductions for depreciation, section 1231 loss, interest, bad debt, and accounting and management fees. Illustrative of Harry's control was the practice of having the Popularch managers sign letters, authorizations and checks for large sums, without knowing the proper need or purpose of such actions. They acted because Harry told them to do so. Fischel and Breen both so testified. The nominal president of Rich was basically uninformed of Rich's corporate *178 activities and the corporation was really run from Harry's office. More than just a high degree of confidence in Harry's guidance was involved; the investors (the partners) simply abdicated any judgment as to what was transpiring in Popularch's business. After all, they had been assured by Harry and the persons associated with him that there was no real risk of true economic loss. Many were old clients and investors with Harry and had unbounded confidence in his ability to manipulate and control events -- especially those involving foreign entities. This was the essence of the system -- assured and predictable results for tax purposes. Concluding our discussion of sham transactions in these consolidated cases, we must observe that there is a permissible area of tax planning within which taxpayers can properly avail themselves of tax advantages which the law, including foreign tax treaties, permits. These are not the issues which arise here. Rather, the concerns and difficulties here arise from the abuse -- not the use -- of permissible tax planning. Congress clearly did not intend that transactions with foreign entities could be so structured that ficticious transactions, lacking *179 any true business purpose, could be expected to survive IRS and judicial scrutiny. The key to this dilemma is the control exercised by Harry over his system and his system entities by which it has to be concluded that transactions within that community were never at arm's length and always were directed solely at tax minimization. It was this interdicted purpose -- not some business consideration -- which is the inherent difficulty. In Saviano v. Commissioner,765 F.2d 643, 654 (7th Cir. 1985), affg. 80 T.C. 955 (1983), the 7th Circuit observed: The freedom to arrange one's affairs to minimize taxes does not include the right to engage in financial fantasies with the expectation that the Internal Revenue Service and the courts will play along. The Commissioner and the courts are empowered, and in fact duty-bound, to look beyond the contrived forms of transactions to their economic substance and to apply the tax laws accordingly. That is what we have done in this case and that is what taxpayers should expect in the future. The financial fantasies in the present consolidated cases require the same result here. Popularch computed its 1971 depreciation *180 deduction, using the income forecast method, on the Johnny distribution rights to be $473,220. Since Popularch had a basis of zero in those distribution rights, as we have held above, Popularch is not entitled to any depreciation deduction under section 167(a) for 1971. 4. Section 1231 Loss of Popularch in 1972.
In 1972, Popularch claimed a section 1231 loss of $526,780 based on a sale price of $1,300,000 for the U.S. distribution rights in Johnny to Alms in which it had a basis of $1,826,780. Because Popularch had no tax basis in the distribution rights, as we have held, above, Popularch could not sustain any loss on their disposition. Additionally, this disposition was part of a sham transaction. The disposition was not a true sale and we do not recognize it as a sale for tax purposes. We hold for respondent on this issue. 5. The Nature of that Loss.
Since we have held that Popularch did not suffer any loss on the sale of the Johnny distribution rights in 1972, we do not need to address whether the alleged loss was a section 1231 loss or a capital loss. 6.Interest Expense Deduction of Popularch in 1972.
Popularch deducted $219,133 as interest *181 paid to Alms in 1972, which respondent has disallowed. The genesis of this interest payment was a money transfer from Alms to Popularch of $2,000,000 on November 25, 1970, which the parties called a loan. Harry had caused Alms to transfer the money to Popularch so that Popularch could pay Koningsplein $1,650,000 as required under their agreement of July 6, 1970 and to repay Anglo Dutch the $350,000 Popularch had borrowed from it in 1970.On the same day that Alms transferred the $2,000,000 to Popularch, Popularch transferred $1,650,000 to Koningsplein, who immediately transferred it back to Alms. No reason was given by petitioners for this last transfer. On the same day that Alms transferred the $2,000,000 to Popularch. Popularch also transferred $350,000 to Anglo Dutch, who then transferred $635,000 to Alms between November 23, and November 25, 1970. No reason was given by petitioners for the transfer from Anglo Dutch to Alms. The payment that Popularch based its interest deduction on was a payment of $754,133 to Alms in the bail-out of July 3, 1972. The parties treated this amount as $535,000 of principal and $219,133 of interest. To make this payment possible, Anglo Dutch *182 transferred $755,000 to Popularch on July 3, 1972. Popularch immediately transferred $754,133 to Alms, which immediately transferred $350,000 to Anglo Dutch and $544,551 to ABC. ABC on the same day transferred $205,294 to Anglo Dutch. Petitioners gave no reason for the transfers by Alms or ABC. It is petitioners' position that the various documents and records introduced into evidence in this case establish that the deduction for interest claimed was in fact interest paid in the taxable year involved and that the payment was on an indebtedness which would be legally enforceable against Popularch under the law. Respondent takes the position that petitioners have failed to establish that the $2,000,000 claimed indebtedness on which the interest deduction for 1972 was based was, in fact, a true indebtedness of Popularch. Respondent argues that the transactions entered into between Popularch and other system entities were shams, and were only consummated in order to produce tax deductions. A taxpayer is entitled to a deduction for all interest paid within a given taxable year on indebtedness. Section 163. Interest is compensation for the use of borrowed money. Deputy v. DuPont,308 U.S. 488, 498 (1940). *183 Interest is deductible only on genuine indebtedness, i.e., indebtedness in substance and not merely form. Knetsch v. United States,364 U.S. 361 (1960). Documents and bookkeeping entries are not dispositive evidence that a transaction has substance. Goldwyn v. Commissioner,9 T.C. 510 (1947), affd. 175 F.2d 641, 644 (9th Cir. 1949). If the purported loan from Alms to Popularch was in fact never made, the deduction claimed for interest would not be allowable. Looking at all the evidence in the instant case, there is a clear indication that in fact no money was lent in a substantive sense by Alms. The record shows that the transfer by Alms to Popularch was part of a preplanned circular money movement lacking any economic substance. The money Alms transferred to Popularch was transferred to Anglo Dutch and Koningsplein who transferred it back to Alms (most of it on the same day). There is substantial testimony in the record with respect to the various money movements made under the direction of Harry. Without repeating in detail the findings we have made above, it is clear that an employee at Harry's office would outline the transfers to be *184 made ahead of time and Harry's office would arrange the transfers of money between system entities. Other factors demonstrating that the debt was sham and not genuine are: no arm's-length negotiations occurred between the parties, since Harry controlled both entities; the loan did not require security, guaranty, or collaterial; the note did not state when interest had to be paid; Popularch made no payment on the loan for a significant period; the only significant payment for which evidence was offered was itself a sham transaction, i.e., the July 1972 $754,133 circular money movement; and petitioners gave no reason for certain transfers which were part of the November 1970 and July 1972 circular money movements. On the basis of this record we conclude that Popularch did not have a true indebtedness of $2,000,000 to Alms and, therefore, the purported payment of $219,133 of interest was not in fact an interest payment and is not deductible by Popularch in 1972. We hold for respondent on this issue. 7.Bad Debt Deduction of $6,187 in 1973.
Respondent disallowed to Popularch a bad debt deduction of $6,187 in 1973 which determination is presumed correct. Respondent's determination *185 is sustained since petitioners have not carried their burden of proof by overcoming respondent's presumption of correctness. Petitioners offered absolutely no proof of the claimed bad debt; they have not demonstrated that anyone was indebted to Popularch and if there was such a debt, that it was worthless. See section 166(a). We hold for respondent on this issue. 8. Accounting and Management Fees of $695 in 1973.
Respondent denied Popularch's deduction of $695 for accounting and management fees in 1973. Since the accounting and management fees were related to these sham transactions already described, we conclude that there was no substance to these claimed expenses. They were so intimately related to a transaction which lacked economic substance as to be a part of that transaction. [29] We holdfor respondent on this issue. 9. Forgiveness of Indebtedness by Alms in 1972.
In the bail-out of July 3, 1972, Popularch transferred its residual movie rights to Alms. Petitioners argue that this would relieve Popularch of its *186 $1,300,000 debt (this amount includes the $100,000 Alms had agreed to pay Koningsplein for Popularch) owed to Alms since those movie rights were worth $1,300,000. Respondent argues that if this Court holds that Popularch was in fact indebted to Alms in the amount of $1,300,000, then the partners (petitioners) have received income from forgiveness of indebtedness, since the value of the U.S. distribution rights to Johnny was only $250,000. Respondent, therefore, contends that there is income from forgiveness of indebtedness in the amount of $1,050,000, equal to the difference between the amount due Alms ($1,300,000), and the value of the property transferred in satisfaction of the debt ($250,000). Since this Court has held above that Popularch was not in fact indebted to Alms, there can be no income arising from the forgiveness of that indebtedness. We hold for petitioners on this issue. 10. Additions to Tax under section 6653(a) for 1971, 1972 and 1973.
Respondent determined section 6653(a) additions to tax against all individual petitioners for the taxable years 1971, 1972 and 1973. Section 6653(a) provides for an addition to tax if "any part of any underpayment *187 * * * of any [income] tax * * * is due to negligence or intentional disregard of the rules and regulations." Petitioners bear the burden of proving that the imposition of these additions was erroneous. Enoch v. Commissioner,57 T.C. 781, 802-803 (1972). Since petitioners were unsophisticated in taxation, they relied on Harry, a tax attorney, to advise them of the tax ramifications of purchasing the distribution rights. Under these circumstances, we conclude that the underpayments of tax in respect of the Popularch issues were not due to petitioners' negligence or intentional disregard of rules and regulations. Hill v. Commissioner,63 T.C. 225, 251 (1974), affd. without published opinion sub nom. Tenner v. Commissioner,551 F.2d 313 (9th Cir. 1977). Respondent's reliance on Vercio v. Commissioner,73 T.C. 1246, 1259 (1980), is misplaced. In Vercio, petitioners were aware that their trust was merely a scheme for tax avoidance. Their attorney advised them not to establish the trust, and their accountant told them he wanted nothing to do with the trust. Petitioners here were not advised by Harry not to *188 invest in Johnny because it was a tax avoidance scheme; thus, petitioners did not disregard the advice of their tax advisers, as did petitioners in Vercio.
11. Withholding Tax Issues for Popularch in 1970 and 1972.
Respondent argues that if this Court holds that Popularch in fact made interest payments to Alms of $219,133 in 1972 and royalty payments to Koningsplein of $2,300,000 in 1970 and $100,000 in 1972, then Popularch should have withheld tax under section 1442 of 30 percent on these interest and royalty payments. Additionally, respondent argues that because Popularch should have withheld tax on such payments but did not do so, it is liable for such withholding tax itself under section 1461. Popularch argues that the payments in question were exempt from withholding. Since we have held that Popularch's transfers to Alms and Koningsplein were shams, there is no reason to require withholding by Popularch on the interest and royalty payments under section 1442, and no basis for the withholding tax deficiencies under section 1461 arising from its failure to withhold on the purported interest and royalty payments. We hold for Popularch on these issues. 12. *189 Additions to Tax for Popularch in 1970 and 1972.
We have already noted respondent's argument that if Popularch made interest payments to Alms and royalty payments to Koningsplein then Popularch itself is liable for deficiencies under section 1461, for not withholding on the interest and royalty payments. Consequently, respondent argues that Popularch failed in 1970 and 1972 to file the withholding returns and pay the withheld taxes as required by sections 6651(a)(1) and 6651(a)(2), respectively, without reasonable cause and due to willful neglect, and also was negligent in failing to pay the withheld tax within the meaning of section 6653(a). Therefore, respondent urges, Popularch is liable for all three of these additions to tax. Because we have held that Popularch's transfers to Alms and Koningsplein were shams, there is no basis for any withholding tax deficiencies. It necessarily follows that there is no basis for any of the three additions to tax. We therefore hold for Popularch on these issues. Since the only deficiencies determined by respondent with respect to Popularch were deficiencies in withholding tax under section 1442 and additions to tax under sections *190 6651(a)(1), 6651(a)(2) and 6653(a), based on the foregoing, Decision will be entered for petitioner Popularch in docket No. 19646-81 at such time as decisions are entered in the remaining dockets.
In all other dockets, an appropriate orderwill be issued restoring them to the general docket for trial of the remaining issues in each case.
Footnotes
1. Cases of other petitioners consolidated for trial, briefing, and opinion, only with respect to issues involving adjustments to Popularch Productions, a California partnership, are as follows: Susan J. Supriano, docket Nos. 4450-74, 5898-76, 6074-77; Walter M. Kearns, Jr., and Abigail Kearns, docket Nos. 4841-74, 7201-75, 2293-79; Stanley Fleishman and Doris Fleishman, docket Nos. 4843-74, 6946-77; Robert Forsberg and Melitta Forsberg, docket No. 5489-74; Estate of William B. Gilbert, Deceased, and Margueritz A. Gilbert, docket No. 5525-74; Irwin Gostin and Margit Gostin, docket Nos. 5532-74, 8032-75, 5123-77; Louis S. Katz and Eleanor Katz, docket Nos. 5541-74, 8037-75, 5134-77; Adolph M. Koven, docket No. 5631-74; Jerome J. Sievers and Marjorie Sievers, docket Nos. 5661-74, 7203-75, 7229-77; Lucille S. Atmore and the Estate of Edward A. Atmore, Deceased, Lucille S. Atmore, Executrix, docket Nos. 5670-74, 8142-75; Lucille S. Atmore, docket No. 6075-77; Sippi Nazarian and Mildred Nazarian, docket No. 5737-74; Mason A. Roberson and Doris B. W. Roberson, docket Nos. 7157-74, 10666-76, 6257-77; Matt D. Offen and Johanne Offen, docket Nos. 8936-74, 10690-76, 6668-78; Victor M. Sborov, docket No. 8979-74; Albert Shell and Martha Shell, docket Nos. 1347-75, 4370-76, 6269-77; Stuart S. Weisenberg and Gilda Weisenberg, docket No. 2279-75; Joseph Weisenberg and Gladys Weisenberg, docket No. 2393-75; Louis Marchisotto and Josephine Marchisotto, docket No. 2400-75; Hillard L. Torgan, docket Nos. 4997-75, 7230-77; Genevieve Torgan, docket Nos. 5001-75, 4231-77; Linda Torgan, docket No. 5336-75; Gary Devore and Marcia C. Devore, docket Nos. 5397-75, 4404-77; William Berman and Nana Berman, docket Nos. 5666-76, 6252-77; Judith P. Breen, docket No. 1955-78; and Popularch Productions, A California Partnership, docket No. 19646-81.↩
2. All section references are to the Internal Revenue Code of 1954, as in effect during the taxable years in issue, unless otherwise noted. All rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise noted.↩
3. These petitioners reported on a cash and fiscal year basis ending June 30 for all years in issue; all other petitioners reported on a cash and calendar year basis, including Popularch Productions, a California partnership. ↩
4. Respondent also determined the following additions to tax for this petitioner which we will not address in this opinion, ↩
Additions to
Tax under
Year
§ 6651(a)
§ 6654
1971
$6,228
$797
1972
24,680
3,159
1973
95,669
12,250
5. The Partnership filed information returns of income on Forms 1065; however, it did not file returns of income tax to be paid at source on Forms 1042. Respondent determined deficiencies in withholding tax and additions to tax for the partnership as follows: ↩
Withholding Tax
Additions to Tax Under
Year
Under § 1442
§ 6651(a)(1)
§ 6651(a)(2)
§ 6653(a)
1970
$690,000
$155,250
$172,500
$34,500
1972
95,740
21,542
23,935
7,787
6. These are two U.S. Supreme Court companion cases dealing with impermissible use of grand jury materials in a civil tax case. See United States v. Sells Engineering, Inc.,463 U.S. 418 (1983) and United States v. Baggot,463 U.S. 476↩ (1983).
7. Some of the final group of partners included clients of Ben and several attorneys (Elaine Fischel, Michael Donner and Quentin Breen), who were, or had been, associated with Harry.↩
8. The original convention was effective January 1, 1947. It was amended by Protocol of September 28, 1964 which exempted certain partnerships, corporations and other entities who received income from a U.S. corporation, 25 percent or more of whose stock was owned by Antilles individuals or companies.↩
9. There was a basic tax advantage in dealing with foreign entities which revolved around special tax treaty provisions and technicalities of U.S. tax law which allegedly permitted various foreign entities to deal with each other with impunity and immunity under U.S. tax laws and with certain U.S. domestic entities in certain specific and precise transactions carefully orchestrated by Harry.↩
10. Documents were frequently left undated, backdated or not executed at all in order to give Harry's planning considerable "flexibility."↩
11. Petitioners objected to the Valkenberg testimony at trial and moved that it be stricken on the grounds that she was unfamiliar with Popularch or the transactions here involved, and wat not employed by CIT during the taxable years at issue. We overruled the objection and denied the motion. Valkenberg's testimony is relevant to the question of routine practices at CIT based on personal knowledge and Harry's relationship with that office in the sham context.↩
*. A petitioner in this case.↩
*. A petitioner in this case.↩
12. Only Harry and Adolphson (his law firm's accountant) communicated with Union Bank concerning the Popularch loan.↩
13. There is no explanation of this discrepancy in the record. ↩
14. See above.↩
15. There is no explanation of why this agreement did not include ABC as a joint venture with Entertainers.↩
16. The word "Photoplay," rather than motion picture, is used in these documents and we will use it here.↩
17. It is not clear from the record what "remaining rights" Popularch had in Johnny after its agreement with Cinemation, discussed above. ↩
18. This amount is unexplained in the record. ↩
19. Presumably a typographical error for "1972."↩
20. These are two U.S. Supreme Court companion cases dealing with impermissible use of grand jury materials in civil matters. United States v. Sells Engineering, Inc.,463 U.S. 418 (1983) and United States v. Baggot,463 U.S. 476↩ (1983).
21. In Karme v. Commissioner,673 F.2d 1062 (9th Cir. 1982), the Circuit Court held that this Court did not err by admitting into evidence other Banco Popular records from Lynch under Fed. R. Evid. 803 (24)↩ as material, probative and serving the interest of justice.
22. At trial, neither party called Harry as a witness. However, his deposition was taken after trial by stipulation. The deposition primarily sought to qualify Harry as an expert in various phases of the entertainment industry including the movies.↩
23. The "Stipulation of Facts" filed is a misnomer. It does not stipulate facts -- for the most part only lengthy documents.↩
24. Because of our holding on the basis issue, it is unnecessary to address the other two rationales advanced by respondent to support his disallowance of the deduction.↩
25. We note that Popularch ostensibly repaid the Anglo Dutch loan of $350,00 by a circulating money movement on November 25, 1970 using part of a $2,000,000 loan from Alms.↩
26. This does not include an amount, either $35,000 or $15,000, allegedly transferred from Alms to Popularch on December 1, 1971. (See Findings of Fact).↩
27. This does not mean that the partners were entitled to a deduction for their share of a Popularch loss. It must first be established that Popularch acquired an asset that was depreciable.↩
28. See also Ford v. Commissioner,T.C. Memo. 1986-104, a case very similar to this one, even to the extent of having many of the same participants. Erhard Seminars Training v. Commissioner,T.C. Memo. 1986-526; Bail Bonds by Marvin Nelson, Inc. v. Commissioner,T.C. Memo. 1986-23; Leonard v. Commissioner,T.C. Memo. 1985-51↩.
29. Leonard v. Commissioner,T.C. Memo. 1985-51↩. Also, petitioners have not substantiated the claimed deductions.